[No. 8066-8-III. Division Three. November 3, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. DAVID CARL
WALL, *Appellant.*

*C. Monty Hormel* and *Hormel & Aiken,* for appellant (appointed counsel for appeal).

*Paul Klasen, Prosecuting Attorney,* for respondent.

THOMPSON, C.J.—David Carl Wall appeals his jury conviction of first degree murder. He contends the court erred when it denied his motion for change of venue based on pretrial publicity and when it allowed the jury to separate during deliberations. Mr. Wall also asserts he was prejudiced by the prosecutor's alleged misconduct during closing argument and by the prosecutor's failure to preserve certain evidence and to disclose other exculpatory evidence. We affirm.

On October 8, 1985, Jaime Dickey, 36, was found dead from a gunshot wound to the head in her home in Warden, Washington. Later that month, Mr. Wall was charged with her murder. The court appointed counsel for him, and released him on bond. His trial commenced on March 24, 1986.

Mr. Wall had rented a room in Ms. Dickey's home for 2 weeks prior to her death. He testified that on the evening of October 7, he stopped at a liquor store on the way home and purchased a bottle of whiskey. When Ms. Dickey arrived from work, she changed into a nightgown, and they watched Monday night football on the living room TV. During that time, Mr. Wall was drinking whiskey from a bottle. After the game ended, he walked to a nearby tavern where he consumed a beer and a half. When he returned, he went through the living room to his bedroom, picking up the whiskey bottle on his way. He slept that night on a love seat in his room because Ms. Dickey's dog was giving birth to puppies on his bed.

According to Mr. Wall, he arose late the next morning, and while he was getting ready for the day he answered a telephone call from Ms. Dickey's employer, Mr. Larry Baker. He told Mr. Baker that Ms. Dickey was not there. He then went to his parents' home to nap before he reported to work at the restaurant/lounge his family owned in Warden.

Later that day, two friends of Ms. Dickey's, who were concerned because she had not reported to work, went to her home to investigate. When no one answered their

knock, they contacted the Warden police chief, Karl Gilje. He entered the house with the two friends, and they discovered Ms. Dickey's body in the living room in a pool of blood under a quilt on the couch. Her nightgown and bathrobe had been pulled up around her shoulders, and the body was positioned face down with the legs pulled up beneath the chest. After the body was cleaned, a bullet wound was discovered in the left eye area. An autopsy showed Ms. Dickey had died sometime during the night of October 7–8 from massive blood loss caused when the bullet severed arteries in her brain.

While semen was not present in the victim's vaginal cavity, the pathologist did discover a black pubic hair lodged near the cervix. The hair did not belong to the victim, but was comparable to samples taken from both Mr. Wall and the victim's ex–husband. The pathologist stated he did not know why the hair was in that location, and he offered an opinion that sheriff's deputies had inadvertently moved it there when they inserted a speculum to take a specimen to test for semen.

Ms. Dickey's house was searched pursuant to a warrant. Police seized the whiskey bottle which was stained with blood of Ms. Dickey's type. They also seized pants, shirt and socks soaking in a washing machine in the house, which witnesses said was similar to clothing Mr. Wall was wearing that evening. The water in the washing machine contained diluted blood of the same type as Ms. Dickey's.

Mr. Wall's father had earlier reported that his .22 revolver had been stolen. The bullet that killed Ms. Dickey was fired from a .22. A witness at trial testified she had overheard Mr. Wall attempting to sell the gun back to his father.

Additional facts will be set out under the issues.

First, did the court err when it denied the defense's motion for change of venue because of pretrial publicity which allegedly endangered Mr. Wall's due process right to a fair and impartial jury?

The venire panel from which the Wall jury was selected numbered 46. When the court asked whether any members of the panel had heard of the case, approximately 85 to 90 percent of the veniremen raised their hands. Defense counsel then moved for a change of venue based on pretrial publicity. In connection with that motion, he submitted two affidavits outlining coverage of the case in the media.

The publicity listed in the affidavits included a radio broadcast made at 8:35 a.m. on March 24, 1986, the day jury selection began, and 16 news articles published in various Grant County newspapers between October 10, 1985, and March 23, 1986. Both the radio item and the March 23 news article mentioned an alleged assault Wall attempted on his own mother in January 1986, while awaiting trial. Many of the articles also stated Wall had been a renter in the Dickey home and had been present there the night of the murder. The articles detailed physical evidence collected at the scene. However, only one of the 16 news articles filed with the affidavits was published in the month preceding the trial. The rest appeared from October through mid–February 1986.

The court reserved ruling on the motion for change of venue until after questioning of the individual veniremen. A jury was selected in a day and a half. The defense used all of its peremptory challenges, and challenged for cause every potential juror who had heard of the case. On appeal, the defense specifically complains that jurors 1, 8, 9, 10, 11, and 12 were not dismissed for cause. While four of these remembered nothing specific about the accounts they had read, two others recalled that the victim had been found in her home and Mr. Wall was on the premises that night. The defense was also concerned because two of the jurors thought the victim's name sounded familiar, and because one of the jurors thought that as information came into evidence it might jog his memory as to what he had read.

■■ The Supreme Court has summarized the law governing motions for change of venue:

A motion for a change of venue in a criminal case is directed to the sound discretion of the trial court. *State v. Stiltner*, 80 Wn.2d 47, 52, 491 P.2d 1043 (1971). The trial court's decision regarding a change of venue motion will not be disturbed on appeal "absent a convincing showing of an abuse of discretion." *State v. Stiltner*, 80 Wn.2d at 52. . . .

While defendant's due process rights are not violated merely by the existence of pretrial publicity, they are violated where pretrial publicity prejudices the defendant's right to an impartial jury. The defendant need not affirmatively show actual prejudice resulting from pretrial publicity. A motion for change of venue must be granted where defendants show an apparent probability of prejudice to their right to an impartial jury.

In ruling on a motion for change of venue because of pretrial publicity, the trial court should consider the following factors:

(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*State v. Crudup*, 11 Wn. App. 583, 587, 524 P.2d 479, *review denied*, 84 Wn.2d 1012 (1974) . . . The trial court may postpone its decision on a motion for change of venue until after the voir dire examination of prospective jurors. *See Crudup*, 11 Wn. App. at 589.

(Citations omitted.) *State v. Laureano*, 101 Wn.2d 745, 756–57, 682 P.2d 889 (1984), *overruled on other grounds in State v. Brown*, 111 Wn.2d 124, 132–33, 761 P.2d 588 (1988).

Courts in rural counties should carefully consider changing venue on high publicity crimes such as homicide, and "should not hesitate to transfer the cause for trial . . . if it

is apparent the local atmosphere has become charged beyond assurance of an impartial jury". *State v. Haynes,* 16 Wn. App. 778, 783, 559 P.2d 583 (1977).

Here, the news articles appended to Mr. Wall's motion for change of venue are largely factual and not sensational-ized. Most of the publicity occurred in the first few weeks after the murder. The trial occurred more than 5 months later. The jury was chosen in less than 2 days from the 46 veniremen in the original panel. Although a large percent-age had heard of the case, many remembered very little about the news coverage.[1] Only those who the court was satisfied could disregard what they had read were allowed to remain as jurors. On the other hand, the articles were circulated throughout the community, and county officials did give some isolated statements to the media. However, it does not appear that they solicited media coverage.

When applied here, the balance of the *State v. Crudup,* 11 Wn. App. 583, 524 P.2d 479, *review denied,* 84 Wn.2d 1012 (1974) factors support the court's decision to deny the motion for a change of venue. We therefore hold Mr. Wall did not show an apparent probability of prejudice to his right to an impartial jury, and the trial court did not abuse its discretion when it denied his motion.

Second, should the court have sequestered the jury?

On the first day of trial, the court entered an order, with Mr. Wall's approval, allowing the jury to separate during trial and during deliberations. On March 28, Mr. Wall renewed his motion for change of venue, citing the continu-ing publicity in the newspaper.

Of particular concern to the defense was a front page article in the Columbia Basin Herald on March 27. It detailed the prosecutor's argument, made outside the jury's

---

[1]The news accounts which mentioned Mr. Wall's alleged attack on his mother and his referral to Eastern State Hospital for a mental health evaluation posed a potential for prejudice. But Mr. Wall did not cite to any place in the record where any of the persons selected as jurors specifically recalled reading about these inci-dents. We are convinced that the reporting was not so sensational as to endanger Mr. Wall's right to a fair and impartial jury.

presence, in support of admitting evidence that Ms. Dickey had told a friend Carl Wall had pressured her for sex. The court had excluded the evidence as hearsay. News articles during trial also continued to refer to the alleged assault by Wall upon his mother in January. However, nowhere in the record did he specifically request the court to sequester the jury or otherwise advise the court that he had changed his mind about the wisdom of permitting the jury to separate. Throughout the trial, the court expressly cautioned the jury not to read the newspaper or listen to the radio or TV reports concerning the trial.

Under CrR 6.7(a): "During trial and deliberations the jury may be allowed to separate unless good cause is shown, on the record, for sequestration of the jury." *State v. Ng,* 104 Wn.2d 763, 776, 713 P.2d 63 (1985), which construed an earlier version of the rule,[2] held:

> To demonstrate that a trial court abused its discretion under CrR 6.7, the defendant must show that either (1) jurors were exposed to publicity during trial, or (2) the publicity during trial was of such a sensational or prejudicial nature that mere risk of exposure created a probability of prejudice.

(Citations omitted.)

Here, publicity during trial concerned evidence which the jury was not allowed to hear. This publicity might be said to be of such a prejudicial nature that under *Ng,* the "mere *risk* of exposure created a probability of prejudice". (Italics ours.) *Ng,* at 776.

██ But even if the decision to allow the jury to separate was error under *Ng,* Mr. Wall has not shown any harm that would require a new trial. While probability of prejudice and not actual prejudice is the test by which we evaluate the court's decision, an error in that decision does not always mandate reversal. *See State v. Cunningham,* 27 Wn. App. 834, 838, 620 P.2d 535 (1980). "A constitutional error

---

[2]Former CrR 6.7(a) stated:

"The jury may be allowed to separate if the court finds that good reason exists to believe that such would not jeopardize a fair trial."

is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986). Here, there is no indication the jury read the news articles in question. In fact, the court specifically ordered the jurors not to read the newspaper. The jury is presumed to follow such an instruction. *State v. Wixon*, 30 Wn. App. 63, 75, 631 P.2d 1033, *review denied*, 96 Wn.2d 1012 (1981). Consequently, we hold any error in allowing the jury to separate was harmless.

Third, did the court err in admitting a photo of the victim's body, and did the prosecutor commit misconduct when he asked the jury to compare the position of the body as shown in the photo to a picture in a Penthouse magazine seized from Mr. Wall's bedroom?

Exhibit 9 is a photograph of the body as it was found on the couch. At pretrial conference, the court reserved ruling on the admissibility of the exhibit, but later admitted it at trial.

Exhibit 27 is a Penthouse magazine. At pretrial conference, defense counsel stated he had no objection to admitting evidence that the magazine was found in Mr. Wall's room and that it had been purchased either the Sunday or Saturday before the killing. The court reserved ruling on whether to admit the magazine itself. At trial, the magazine was offered and admitted without objection by the defense. Deputy Michael Shay testified it was open to page 41 when he found it.

During closing argument, the prosecutor made this statement:

> You talk about the sex, you will have the Penthouse Magazine. The officer said it was open to page 51. I hate to even— I took a look at it, just a few minutes ago. I don't recommend it to you, but curiosity, you might take a look at page 51 and you might take a look at the picture of Jaime after they pulled the blanket off of her, and

I think there is a certain amount of relevancy between that sexual magazine, Penthouse, and how Jaime looks.

After argument and out of the jury's presence, defense counsel argued that it was never his understanding that the magazine was admitted for any purpose other than that discussed at pretrial conference. He also pointed out the prosecutor's error as to the page that the magazine was open to when found by the officer. The judge ruled that the magazine itself would not go to the jury, and he submitted the following additional instruction:

> The jury may consider Plaintiff's Exhibit No. 27, the Penthouse Magazine, for all purposes mentioned during the testimony. The court has ruled that the exhibit should not be delivered to the jury in the deliberation room for further consideration.

The premise of Mr. Wall's argument that the photograph of the body should not have been admitted is that since there was no semen in the victim's vagina, sex could not have been part of the crime. Consequently, the picture was not relevant. He cites *State v. Cameron,* 100 Wn.2d 520, 529, 674 P.2d 650 (1983), in which the court disapproved the admission of two pubic hairs found on the murder victim's knee and in her hand in a case where the possibility of a sexual attack was "wholly unsupported by the record".

Unlike *Cameron* and contrary to Mr. Wall's argument, the evidence here did suggest a sexual attack. The body allegedly was turned over after the shooting and placed in a position which exposed the genitals. There was evidence her panties had been cut off. Ms. Dickey's nightgown was pulled up around her shoulders. A foreign hair was found in the vagina. The absence of semen is not proof a sexual attack did not occur. We hold the photo was relevant to the issues presented. *See* ER 401; *State v. Sabbot,* 16 Wn. App. 929, 931, 561 P.2d 212 (1977) (evidence having a reasonable connection with the issues as well as all evidence tending to establish or disestablish a material fact should be admitted).

 The next question is whether, under ER 403,[3] the probative value of the photograph was substantially outweighed by the danger of unfair prejudice. "The result of a trial court's balancing of the probative value of admitting evidence as against the prejudicial effect on the jury is reviewed by this court only for abuse of discretion." *State v. Harris,* 106 Wn.2d 784, 791, 725 P.2d 975 (1986), *cert. denied,* 480 U.S. 940, 94 L. Ed. 2d 781, 107 S. Ct. 1592 (1987); *State v. Rice,* 110 Wn.2d 577, 599–600, 757 P.2d 889 (1988). The photograph here shows a side view of the body and illustrates the testimony concerning its position on the couch. We hold the picture is not unduly inflammatory, and the court did not abuse its discretion in admitting it.

 Finally, there is no dispute that the prosecutor erred when he directed the jurors' attention to page 51 of the Penthouse magazine and invited them to compare the picture there to the picture of the victim's body. However, in cases of prosecutorial misconduct, the reviewing court examines the entire record and determines whether there is a substantial likelihood that the misconduct affected the verdict, thereby denying the defendant a fair trial. *Rice,* at 602; *State v. Davenport,* 100 Wn.2d 757, 762–63, 675 P.2d 1213 (1984).

The record here does not indicate a substantial likelihood the misconduct affected the verdict. The prosecutor did not dwell on the point beyond the one statement quoted above. The magazine was never shown to the jury nor allowed into the jury room and the court instructed the jury not to consider the magazine for any purpose except as it related to testimony at trial. The prosecutor's conduct was not so flagrant and ill intentioned that the curative instruction did not obviate any prejudice it may have engendered. Contrast

---

[3]ER 403 reads:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

*State v. Belgarde,* 110 Wn.2d 504, 508, 755 P.2d 174 (1988).

Fourth, was Mr. Wall deprived of due process by the State's failure (1) to preserve certain evidence, and (2) to turn over allegedly exculpatory evidence in a timely fashion?

The police released the residence to Charles Dickey, the deceased's ex–husband, within 2 days of her death. But first, the police conducted an 8–hour search, during which they vacuumed the couch on which the body had been found and tore the tab off the soapbox located on top of the washing machine which contained the bloody clothes. The couch and the box were later destroyed or lost. Following the close of the State's evidence, defense counsel unsuccessfully moved for a dismissal based on destruction of the evidence.

The omnibus order required the State to produce names of persons interviewed who gave information tending to exculpate Mr. Wall. In January 1986, Kathy Maestes reported to police she had seen Mr. Wall, Sr.'s .22 revolver at the home of Johnny Reitz, whom Jaime Dickey had once accused of theft. The police requested the defense back off its investigation of this matter while they attempted to set up a buy of the weapon. It was not until March 11 that the police advised Mr. Wall that the information about the sighting of the gun was unreliable. The Wall gun was a revolver, but at trial Kathy Maestes testified that the gun she observed in Reitz' possession did not have a cylinder.

## A
### FAILURE TO PRESERVE EVIDENCE

■ The State has a duty to preserve material evidence. *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963); *State v. Wright,* 87 Wn.2d 783, 793, 557 P.2d 1 (1976). To determine the materiality of missing evidence, Washington employs a balancing test. *State v. Campbell,* 103 Wn.2d 1, 18–19, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985); *State v.*

*Vaster,* 99 Wn.2d 44, 52, 659 P.2d 528 (1983). The court first considers whether there exists a reasonable possibility, in light of the particular circumstances of the given case, that the missing evidence would have affected the defendant's ability to present a defense. *State v. Vaster, supra.* Next, the court balances the consideration of "reasonableness" against the ability of the prosecutor to have preserved the evidence. *State v. Vaster, supra.*

"The burden of establishing . . . 'reasonable possibility' rests with the defendant." *Vaster,* at 52. If the court determines no such reasonable possibility exists, then the lost evidence is not sufficiently material to constitute a due process violation. *Vaster.* Where the case against the defendant is strong, it "greatly decreases the possibility that the evidence in question would have exonerated" the defendant. *Vaster,* at 53.

Here, even if the police had preserved the couch and the soapbox, it is unlikely any new evidence derived from those items would have exculpated Mr. Wall. Ms. Dickey and Mr. Wall were not the only persons who had been in the house. Ms. Dickey's children, former husband and friends also had been there recently. The fact that prints or hairs other than Mr. Wall's might have been found on the couch or soapbox would not serve to exonerate Mr. Wall. Nor would he be exonerated by the possibility that blood splatters on the couch may have shown that Ms. Dickey had pulled herself to a kneeling position, perhaps to look at an intruder coming in the front door, was shot, and then fell face down. The State's duty to preserve potentially exculpatory evidence does not mean the police are required to seek out exculpatory evidence, conduct tests, or exhaust every angle on a case. *State v. Judge,* 100 Wn.2d 706, 717, 675 P.2d 219 (1984); *State v. Jones,* 26 Wn. App. 551, 554, 614 P.2d 190, *review denied,* 94 Wn.2d 1008 (1980).

Moreover, the evidence against Mr. Wall was strong. It included the fact of his presence in the house that night, the discovery of clothes in the bloody water of the washing machine which matched witnesses' descriptions of the

clothing Mr. Wall was wearing that night, the identification of his fingerprint on the whiskey bottle superimposed over a stain identified as the decedent's blood, and testimony that he knew the whereabouts of his father's stolen .22, the type of gun that killed Ms. Dickey. Under *Vaster,* this evidence decreases the possibility that the missing evidence would have exonerated Mr. Wall.

Accordingly, we hold Mr. Wall failed to meet his burden of establishing a reasonable possibility that the missing evidence affected his ability to present his defense.

## B
### FAILURE TO TIMELY DISCLOSE INFORMATION ABOUT THE GUN

CrR 4.7(a)(3) requires the prosecutor to disclose "any material or information within [his] knowledge which tends to negate defendant's guilt as to the offense charged". This and other of the discovery rules are designed to protect both parties from surprise. *State v. Coe,* 101 Wn.2d 772, 783, 684 P.2d 668 (1984).

█ It appears that Mr. Wall knew in January of Kathy Maestes' claim that she saw the .22 at the Reitzes' home. What he complains about is that the prosecutor did not let him know until several weeks later that the police investigation of the allegation had not turned up anything. We do not see how this fact amounts to a failure by the prosecutor to disclose *exculpatory* evidence. Moreover, the State's failure to disclose exculpatory evidence is harmless if the evidence was not substantial enough to have created a reasonable doubt that did not otherwise exist. *State v. Campbell, supra* at 17. The prosecutor brought out in his cross examination of Kathy Maestes that the gun she saw at the Reitzes' home did not have a cylinder. This testimony raises questions about whether the Wall gun and the gun at the Reitzes' home were the same.

Based on these facts, we conclude that the prosecutor's failure to timely disclose that the police had ceased investigating Maestes' claim either was not a failure to disclose

*exculpatory* evidence or was harmless.[4]

Mr. Wall further complains that the State violated the omnibus order by identifying one person as its fingerprint expert, then eliciting testimony from another, William Morig, a criminalist, that the print on the whiskey bottle was made *over* the blood. Walt Wanzenreid identified the fingerprint as Mr. Wall's, and William Morig testified the print was made over the blood on the bottle. Mr. Wall's argument ignores Mr. Morig's own explanation that while he is not qualified to compare prints, he has the expertise to say that a given mark appears to be a latent print. We find no violation of the omnibus order based on these facts.

Fifth, is a new trial warranted based on the accumulation of errors rule?

"The combined effect of an accumulation of errors, no one of which, perhaps, standing alone might be of sufficient gravity to constitute grounds for reversal, may well require a new trial." *State v. Badda,* 63 Wn.2d 176, 183, 385 P.2d 859 (1963). *See also Coe,* at 789.

The only possible errors here were the order allowing the jury to separate, the prosecutor's mistake in reference to the Penthouse magazine, and late disclosure of the results of the police investigation of the gun. As discussed above, none of these standing alone warrants reversal. Nor is there any reasonable argument that the three combined prejudiced Mr. Wall's right to a fair trial.

■ Sixth, was trial counsel incompetent? The test for effective representation of counsel is whether, after examining the entire record, the reviewing court can conclude the defendant received effective representation and a fair trial. To prevail on such a claim, defendant must show he was prejudiced by the alleged incompetence. *State v. Ciskie,* 110 Wn.2d 263, 284, 751 P.2d 1165 (1988); *In re*

---

[4]Mr. Wall also assigns error to the trial court's denial of his motion for new trial. In that motion, he raised the same issues which he now raises on appeal. Thus, our discussion of issues one through four disposes of this assignment of error.

*Jeffries,* 110 Wn.2d 326, 331, 752 P.2d 1338 (1988). "If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel." *State v. Mak,* 105 Wn.2d 692, 731, 718 P.2d 407, *cert. denied,* 479 U.S. 995, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986).

Here, Mr. Wall complained his trial counsel: (1) failed to call John Wall, Sr., as a witness to rebut inferences that his son stole the .22 from him; (2) outlined defense tactics different from those actually utilized; and (3) advised Mr. Wall not to show emotion at trial, which possibly cast him in a negative light to the jury. However, there is no showing on the record as to what Mr. Wall, Sr.'s testimony would have been if called. Mr. Wall's other complaints clearly concerned trial counsel's trial tactics. We have read the entire record and are of the opinion trial counsel waged an active defense. We conclude Mr. Wall was not denied effective assistance of counsel.

Affirmed.

MUNSON, J., and STAUFFACHER, J. Pro Tem., concur.

Review denied by Supreme Court February 28, 1989.