[No. 12524-2-II. Division Two. October 18, 1989.]

THE STATE OF WASHINGTON, *Respondent*, v. SEAN ALLEN STEVENSON, *Appellant*.

726

*John Thomas Day* and *Leslie O. Stomsvik,* for appellant (appointed counsel for appeal).

*Robert K. Leick, Prosecuting Attorney,* and *Grant E. Hansen, Deputy,* for respondent.

REED, J.—Sean Stevenson appeals from his convictions of two counts of first degree murder and one count of aggravated first degree murder, contending that the State conducted an illegal search and seizure and failed to preserve evidence, that the trial court erred in declining juvenile jurisdiction, and that his sentence was both improperly excessive and cruel and unusual. We affirm.

The charges were based on the January 1, 1987, murders of James Butler, Margaret Butler and Amy Stevenson, Stevenson's stepfather, mother and sister. Each victim was shot in the head at close range with a high–powered firearm. Amy had been raped. Stevenson, who was then 16 years of age, fled the area on the morning of the murders,

taking most of his personal belongings with him. He asked his girl friend to go to Mexico with him, explaining to her and several other people that he had killed his family. Later that same morning, when he was approached by Police Officer Steve Graves at a Long Beach, Washington, telephone booth, he also told Graves that he had just killed three members of his family. Officer Graves placed the defendant under arrest and telephoned the Skamania County Sheriff's Office, which dispatched Officer Tom Converse to the defendant's home.

Officer Converse peered into a window of the house and saw the body of Margaret Butler lying in a bed. She clearly had been shot. He called for a backup unit, and Officer Chris Ford responded. The two officers entered the house to determine whether any of the victims were still alive and whether any assailant was still present. They discovered the body of James Butler, lying on the floor in the bedroom with Margaret Butler. They found Amy Stevenson in the basement. She was naked from the waist down and was lying on a bed. Semen was visible in her pubic area, and a .22 caliber rifle was lying close by. Throughout their initial sweep, the officers took note of numerous evidentiary items in plain view, including pools and spatterings of blood and other human tissue, a wallet, a broken pottery bank, shell casings, the semen stain on Amy Stevenson's body, and the .22 caliber rifle nearby. Because of their desire to preserve the scene, they did not remove any of these items, but, instead, waited outside the house for the arrival of the County's Criminal Investigation Unit.[1] Members of the unit arrived shortly thereafter and spent several hours collecting the evidence including firearms, bullets, spent shell casings, blood and semen samples, and clothing. Over 200 photographs of the scene were taken. After completing the

---

[1]The Coroner, who is also the County Prosecuting Attorney, and Deputy Grossie, comprise the County's Criminal Investigation Unit (CIU). They were accompanied by a special investigator borrowed from neighboring Cowlitz County Sheriff's Office.

investigation, the authorities turned over the house to the relatives of the victims, who cleaned it, washing blood and other matter off the walls and burning blood–soaked mattresses, bedding and the chair in which James Butler had been shot.

Following a hearing pursuant to RCW 13.40.110, the juvenile court elected to decline jurisdiction. Stevenson was tried by jury and found guilty of one count of aggravated first degree murder and two counts of first degree murder. His sentence for the aggravated murder was life imprisonment without the possibility of parole. For the other crimes, he received two concurrent 320–month sentences, which were made consecutive to his life sentence.

## I

Stevenson first contends that the evidence obtained from his house should have been suppressed because it was illegally seized. He acknowledges that Officers Converse and Ford had a right to enter the house. However, he maintains that the emergency created by the discovery of the crimes had ended by the time the officers from the investigatory unit entered the house, and that they were, therefore, required to obtain a warrant before they could properly search the premises and collect evidence. He is wrong.

■■ Warrantless searches and seizures are per se unreasonable. U.S. Const. amend. 4; Const. art. 1, § 7; *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971); *State v. Chrisman,* 100 Wn.2d 814, 818, 676 P.2d 419 (1984). There are, however, a few "jealously and carefully draw exceptions" to the warrant requirement which provide for those cases where the societal costs of obtaining a warrant outweigh the reasons for insisting upon prior recourse to a neutral magistrate. *State v. Williams,* 102 Wn.2d 733, 736, 689 P.2d 1065 (1984), quoting *State v. Houser,* 95 Wn.2d 143, 149, 622 P.2d 1218 (1980). One such exception applies to emergency situations, including the discovery of a crime. Thus, when the police come upon the scene of a homicide, they may make a prompt warrantless

search of the area to see if there are other victims or if a killer is still on the premises. They may also seize any evidence that is in plain view "during the course of their legitimate emergency activities." *Mincey v. Arizona,* 437 U.S. 385, 393, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408 (1978); *State v. Sanders,* 8 Wn. App. 306, 313, 506 P.2d 892 (1973). Here, there is no question that an emergency existed. The officers dispatched to the Butler home were told that a shooting had occurred and that there might be multiple victims. They did not know how many assailants were involved. They saw one body through the window, entered, and embarked upon an initial sweep of the house to assess the situation and render emergency assistance, if needed.

 Stevenson concedes that these actions were proper, and that those officers could have seized any evidence that was in plain view.[2] He simply contends that the right to collect this evidence without a warrant was foreclosed when they left the house. This is not the law.

There is no requirement that the evidence be collected at the time it is observed, no requirement that the circumstances which justified the initial intrusion exist at the time of the seizure, and no requirement that the officers who originally observed and identified it as evidence of a crime, personally seize it. *See State v. Bell,* 108 Wn.2d 193, 198–201, 737 P.2d 254 (1987), in which the court held proper the seizure by police of marijuana plants earlier observed by fire fighters who responded to an alarm at the defendant's residence, and *Michigan v. Tyler,* 436 U.S. 499, 511, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978), which held that fire officials were not required to obtain a search warrant to determine the cause of a fire when they reentered the burned building 4 hours after steam, smoke and darkness had

---

[2]The plain view doctrine applies when three requirements are met: (1) the police have a prior justification for the intrusion into the constitutionally protected area; (2) they inadvertently discover incriminating evidence; and (3) they immediately recognize that they have such evidence before them. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971); *State v. Kennedy,* 107 Wn.2d 1, 13, 726 P.2d 445 (1986).

forced them to postpone their initial lawful investigation. The Court concluded that the later entries were "no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." 436 U.S. at 511. *See also State v. Martin,* 274 N.W.2d 893 (S.D.), *cert. denied,* 444 U.S. 883 (1979); *State v. Johnson,* 413 A.2d 931 (Me. 1980); *State v. Anderson,* 42 Or. App. 29, 599 P.2d 1225 (1979), *cert. denied,* 446 U.S. 920 (1980); *People v. Harding,* 620 P.2d 245 (Colo. 1980); 2 W. LaFave, *Search and Seizure* § 6.5(e) (1978). As the *Bell* court observed, once the privacy of the residence lawfully has been invaded, it is senseless to require a warrant for others to enter and complete what those already on the scene would be justified in doing.[3]

We see no reason why this rule should not apply to the present situation. Having other more immediate concerns, the officers had not collected evidence during the first sweep. Rather, they waited for the better equipped investigative unit to arrive on the scene. This was surely reasonable in view of the need to be certain the evidence properly would be preserved.[4] The second entry followed hard on the heels of the initial sweep and was nothing more than a continuation of the prior lawful search.

---

[3]*See also United States v. Green,* 474 F.2d 1385 (5th Cir.), *cert. denied,* 414 U.S. 829 (1973); *Steigler v. Anderson,* 496 F.2d 793 (3d Cir.), *cert. denied,* 419 U.S. 1002 (1974); *United States v. Gargotto,* 476 F.2d 1009 (6th Cir. 1973); *United States v. Brand,* 556 F.2d 1312 (5th Cir. 1977), *cert. denied,* 434 U.S. 1063 (1978).

[4]Possible "trace evidence" such as hair, fibers, bodily secretions, scratches and bite marks, often present in violent crimes, may dissipate or be brushed away before it can be preserved. Given the evanescent nature of such evidence, which indeed was found on the premises, we think the officers were justified in reentering the home and in collecting and preserving the evidence as promptly as they reasonably deemed necessary. *See State v. Smith,* 88 Wn.2d 127, 138–39, 559 P.2d 970, *cert. denied,* 434 U.S. 876 (1977); *State v. Welker,* 37 Wn. App. 628, 633–34, 683 P.2d 1110 (citing *United States v. Minick,* 455 A.2d 874 (D.C.), *cert. denied,* 464 U.S. 831 (1983)), *review denied,* 102 Wn.2d 1006 (1984). *See also* concurring opinion of Justice Rehnquist in *Mincey v. Arizona,* 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978).

■ Of course, the officers who enter later may not exceed the scope of the earlier intrusion. *See Mincey v. Arizona,* 437 U.S. at 393, 57 L. Ed. 2d at 300; *State v. Bell,* 108 Wn.2d at 201. In this case the "plain view" doctrine supports the seizure of all evidence with the exception of the bullet that killed Margaret Butler,[5] and the admission of that item was harmless. As noted in part II, *infra,* the State presented a remarkable quantity of evidence far more damaging than this single bullet. Its admission could not possibly have affected the result of the trial. *State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986); *State v. Wood,* 45 Wn. App. 299, 311, 725 P.2d 435, *review denied,* 107 Wn.2d 1017 (1986).

## II

■ The defendant next alleges that certain items of evidence were destroyed or improperly preserved and that others never were collected. He specifically asserts that three kinds of potentially exculpatory evidence were not available to him: (1) the State did not keep careful records of body temperatures or stomach contents, which could have demonstrated the sequence in which the victims were killed; (2) the State did not take hair samples from James Butler, nor did it preserve blood samples taken from him or semen samples taken from Amy Butler so as to permit cross–matching in a manner other than an A–B–O typing system; and (3) the State did not preserve the chair in which James Butler was sitting when he was shot, blood spatter patterns, and possible fingerprints and footprints,

---

[5]Defense counsel argues simply that all of the evidence should be suppressed. He has made no attempt to distinguish between what was observed by the first officers and what was later discovered by the investigators. Our review of the record indicates that the only significant evidence produced by the search was the bullet mentioned above. It traveled through Margaret Butler's head, pillow and mattress before becoming embedded in a bedpost, where it was found during the second search of the house.

This case is thus distinguishable from *Thompson v. Louisiana,* 469 U.S. 17, 83 L. Ed. 2d 246, 105 S. Ct. 409 (1984) and *Mincey v. Arizona, supra,* both of which involved seizure of incriminating evidence from drawers, closets, wastebaskets, and other concealed places.

which could have demonstrated the angle of fire and approximate range from which the firing occurred. We are mindful of the fragile nature of this potential evidence and agree that the State should have expended a greater effort to preserve it. However, we do not believe that the unavailability of this evidence violated Stevenson's due process right to a fair trial. In cases where there has been an inadvertent or good faith loss of evidence,[6] the court must weigh the burden imposed on the defendant in proving the exculpatory value of lost evidence against the burden imposed on the prosecution of preserving all potentially material evidence.[7] In doing so, it must first consider whether the defendant has established a

> *reasonable possibility* that the missing evidence would have affected the defendant's ability to present a defense. The burden of establishing that "reasonable possibility" rests with the defendant. "Reasonableness" must be determined in light of the peculiar circumstance of each case. Lost or destroyed evidence which does not rise to the level of establishing a "reasonable possibility" that it will exculpate a defendant will be deemed insufficiently material to constitute a due process violation.

*State v. Vaster*, 99 Wn.2d 44, 52, 659 P.2d 528 (1983).

In considering the value of the missing evidence, the court must review the entire record, including evidence of guilt and other evidence of the defense, to determine whether a reasonable possibility exists that the lost evidence would be exculpatory. *Seattle v. Duncan*, 44 Wn. App. 735, 740, 723 P.2d 1156 (1986) (citing *State v. Huxoll*, 38 Wn. App. 360, 366, 685 P.2d 628, *review denied*, 102 Wn.2d 1021 (1984)).

Next, the court must balance the probative value of the evidence against the prosecution's ability to have preserved

---

[6]There is no contention here that the State acted in bad faith.

[7]However, the State's "duty to preserve potentially exculpatory evidence does not mean the police are required to seek out exculpatory evidence, conduct tests, or exhaust every angle on a case." *State v. Wall*, 52 Wn. App. 665, 677, 763 P.2d 462 (citing *State v. Judge*, 100 Wn.2d 706, 717, 675 P.2d 219 (1984)), *review denied*, 112 Wn.2d 1008 (1988).

it, considering the procedures established for preserving evidence, the nature of the missing evidence, and the circumstances surrounding its loss. *State v. Vaster,* 99 Wn.2d at 52.

Where there is strong evidence of guilt, and relatively low probability that the lost evidence will be exculpatory, there is no violation of the defendant's due process rights. *See State v. Vaster,* 99 Wn.2d at 52–54 (inadvertent destruction of vaginal fluid sample not a due process violation because of extremely strong evidence of guilt, including eyewitness identification); *State v. Campbell,* 103 Wn.2d 1, 18–19, 691 P.2d 929 (1984) (loss of police notes did not violate due process), *cert. denied,* 471 U.S. 1094 (1985); *State v. Laureano,* 101 Wn.2d 745, 682 P.2d 889 (1984), (plurality) (loss or destruction of tape recording of interview with defendant did not violate due process), *overruled on other grounds in State v. Brown,* 111 Wn.2d 124, 761 P.2d 588 (1988); *State v. Gilcrist,* 91 Wn.2d 603, 609, 590 P.2d 809 (1979) (loss of hair sample did not violate due process).

In this case, as in *Gilcrist,* the missing evidence was only circumstantially related to the question of Stevenson's innocence. At best, it would have indicated the height and angle from which the gun was fired, and the sequence of the deaths, and provided some additional information about the individual who had raped Amy Stevenson.[8] None of this information would automatically exculpate the defendant or even materially contribute to his defense.

Moreover, as in *Vaster,* there was overwhelming evidence of guilt in the present case that weighs heavily against the defendant's burden of showing that the missing evidence was exculpatory. This evidence included approximately six

---

[8]Notably, the only alternative rapist suggested by counsel is James Butler. Butler, however, had undergone a vasectomy and could not have contributed the sperm found in Amy Stevenson's vagina. It is, thus, highly unlikely that more specific identification of the semen would have been useful to the defendant.

separate confessions and inculpatory statements.[9] There was also evidence showing that the defendant was at or near the Butler residence the night of the killings; that the victims were last seen alive in the early morning hours of January 1, 1987, and were found only a few hours later; that the probable weapons used were a .22 caliber Premier rifle and a .30–30 Marlin; that a .22 caliber rifle belonging to the defendant was found near Amy Stevenson's body; that shell casings coming from a .30–30 Marlin were found near the bodies of James and Margaret Butler; that the defendant was in possession of a .30–30 Marlin when arrested. In addition, blood was found on the defendant's shoes (type B); money (type AB) and jeans; James Butler had type B blood, Margaret Butler had type AB blood, and the defendant had type A blood. Finally, there was testimony that Stevenson had made a threat against the life of Margaret Butler.

A review of the entire record clearly indicates that there was no reasonable possibility that any lost evidence would have been exculpatory. Therefore we need not reach the second consideration under *Vaster*. No constitutional error occurred.

### III

██ Stevenson also asserts that the juvenile court's decision to decline jurisdiction over his case was inconsistent with the standards set forth in *Kent v. United States,* 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966).

Pursuant to RCW 13.40.110, the court may transfer the case for adult prosecution upon a finding that the declination would be in the best interest of the juvenile or the public. Its decision is discretionary and is subject to reversal only if exercised upon a ground, or to an extent, clearly untenable or manifestly unreasonable. *State v. Toomey,* 38 Wn. App. 831, 834, 690 P.2d 1175 (1984), *review denied,*

---

[9]A defendant's admissions are the most probative and damaging evidence. *State v. Sellers,* 39 Wn. App. 799, 805, 695 P.2d 1014, *review denied,* 103 Wn.2d 1036 (1985).

103 Wn.2d 1012, *cert. denied,* 471 U.S. 1067 (1985). Discretion is not properly exercised unless appropriate consideration is given to the *Kent* standards. However, not all the standards must be satisfied. *State v. Toomey, supra* at 834. The court's finding must be supported by relevant facts and opinions produced at the declination hearing. Factual determinations must be based on a preponderance of evidence and will not be disturbed on appeal if supported by substantial evidence. *Toomey,* 38 Wn. App. at 834; *State v. Barriault,* 20 Wn. App. 419, 581 P.2d 1365 (1978).

The eight factors listed in *Kent v. United States, supra,* include:

1. The defendant's lack of a record of prior convictions;
2. The defendant's sophistication and attitude; and
3. The defendant's prospects for rehabilitation in the juvenile system.[10]

Stevenson maintains that the first three factors indicated positive aspects of his character, and did not support declination. Therefore, he argues, the juvenile court was required to retain jurisdiction. We disagree. Of the three factors cited by Stevenson, the juvenile judge agreed that the first two (lack of criminal history and degree of sophistication, etc.)[11] did not support declination. However, he found that Stevenson's prospects for reasonable rehabilitation within the amount of time available in the juvenile system were highly speculative. He noted that at least one of the psychologists who had examined Stevenson had

---

[10]The other five factors are:

1. The seriousness of the alleged offense and whether the protection of the community necessitates prosecution of the case under the adult system.

2. The degree of premeditation, willfulness, violence and aggression involved in the alleged offense.

3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if injury resulted.

4. The prosecutive merit of the complaint.

5. The desirability of trial and disposition of the entire offense in one court when the defendant's associates are adults.

[11]He found Stevenson to be a troubled youth with a gross pathology and felt those problems weighed against a finding of sophistication and maturity.

questioned whether he was treatable at all. He considered the serious and violent nature of the crimes, and the indications of willfulness and premeditation and concluded that declination was required in the interests of public safety.

The record indicates that the court's decision was based on substantial evidence received at the declination hearing. It shows that the court gave all due consideration to each of the *Kent* criteria, as well as to the purposes behind the juvenile justice act, and that its decision was based on a proper balancing of all factors. There was no abuse of discretion.

## IV

■ Stevenson's last claims pertain to the propriety of his sentences. He argues first that his mandatory life sentence constitutes cruel and unusual punishment in violation of the eighth amendment to the United States Constitution. He bases this proposition on the decision in *Thompson v. Oklahoma,* __ U.S. __, 101 L. Ed. 2d 702, 108 S. Ct. 2687 (1988) that the execution of a 15–year–old is prohibited by the Eighth Amendment.

The rule in *Thompson v. Oklahoma, supra,* does not apply to Stevenson for two reasons. First, he is not 15. *Thompson* held only that the death penalty may not be imposed upon anyone who was under the age of 16 at the time of the offense. The Supreme Court recently has held that a death sentence imposed upon a defendant who was 16 years old at the time of the offense does not violate the Eighth Amendment. *See Stanford v. Kentucky,* __ U.S. __, 106 L. Ed. 2d 306, 109 S. Ct. 2969 (1989).

Second, life in prison without the possibility of parole cannot be equated with death. While a mandatory life sentence does deprive a defendant of many of the pleasures of life, it certainly does not deprive him of all of them. The *Thompson* Court prohibited no punishment except the death penalty, and there is absolutely nothing in that decision that supports a broader restriction. Stevenson has been convicted of three extremely vicious crimes. Society

has the right to protect itself from such conduct. The mandatory life sentence imposed upon Stevenson was clearly not a "purposeless and needless imposition of pain and suffering". *Thompson v. Oklahoma,* 101 L. Ed. 2d at 720. It was, therefore, not an unconstitutional punishment.

Stevenson's other assignments of error clearly have no merit.

Judgment and sentence affirmed.

ALEXANDER, C.J., and PETRICH, J., concur.

Review denied at 113 Wn.2d 1040 (1990).