[Nos. 28291-3-I; 31424-6-I.   Division One.   September 13, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. VICTOR G. GOCKEN, *Appellant.*

*In the Matter of the Personal Restraint of* VICTOR G. GOCKEN, *Petitioner.*

*Joshua Weinstein* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *John Belatti, Deputy,* for respondent.

AGID, J. — Victor Gocken appeals his judgment and sentence on one count of first degree murder and eight counts of forgery. He argues that: (1) the warrantless searches of the victim's condominium, where Gocken also lived, were unlaw-

ful because there was no valid exception to the warrant requirement; (2) the State's amendment of the information adding the forgery counts on the first day of trial deprived him of his constitutional right to be notified of the charges against him; (3) the trial court erred by admitting autopsy photographs; (4) the evidence was insufficient to support a finding of premeditation; and (5) the testimony of four witnesses was improper because the record does not reflect that they responded to the oath administered before each testified. Gocken has also filed pro se briefs, and his personal restraint petition has been consolidated with this appeal. We affirm the trial court's judgment and sentence and deny Gocken's petition.

## I
### FACTS

On June 16, 1990, Officer Martin Brunette of the Auburn Police Department arrived at 72-year-old Ann Compton's condominium in response to a call from her friend Norma Haskell who had been unable to reach Compton for some time. Officer Brunette was aware that Compton was elderly and had mental health problems because she had a reputation at the police station for making "crazy" calls complaining that people from federal and local agencies were watching her.

When no one responded after Officer Brunette knocked on Compton's door and announced that he was from the police, he decided to perform a routine health and safety check[1] to see if Compton might have been injured and in need of assistance. He entered the condominium without a warrant through an unlocked window. He found the home very neat and orderly except for an unkempt bedroom with men's effects.[2] He also

---

[1] In their testimony, the officers referred to it as a "welfare check". Because that term can be confused with investigations by public assistance caseworkers, we have substituted "health and safety check" to describe the officers' actions.

[2] Haskell had told Officer Brunette that Compton had a roommate. Gocken, who was 36 in 1990, began sharing Compton's condominium with her in October 1989. They had a platonic relationship, and Gocken did odd jobs for Compton in lieu of paying rent.

saw a large door at the end of the hallway which he assumed was a closet. The door was locked but there was nothing unusual about it. When Officer Brunette initially entered the condominium, he had been aware that he might smell a dead body because Haskell was concerned that Compton had been injured.[3] However, he smelled no odors and, seeing nothing amiss, left the condominium.

Eight days later, on June 24, Officer Brunette responded to a second dispatch to Compton's condominium, assuming it would involve another health and safety check. Haskell was outside waiting with another woman. Because nothing around the condominium appeared unusual, Brunette did not enter it. He did not write a report for either of the two visits because he considered them only routine health and safety checks, not criminal investigations.[4]

At about the same time, Diana Berthon, Compton's niece, also became worried about Compton because she had not seen her for several weeks. On Thursday, June 20, Berthon left a note on Compton's door asking her to call. Later that day, Berthon received a call on her answering machine from Gocken saying that Compton had gone "over the mountains" and that he would be going to get her. On June 21, Berthon went to Compton's home and found a note signed "Ann" indicating she would be back Monday, June 25, but the note was not in Compton's handwriting. Berthon called the police and was advised that she should file a missing person report if Compton had not returned by Monday.

Because Berthon could not reach Compton on Monday, she filed the report with the police. Officer Victor Shively, who was not aware of Officer Brunette's previous visits, accompanied Berthon to Compton's condominium at 10 a.m. to do a health and safety check. Shively had met Compton once and remembered making a police call to her condominium about

---

[3] Officer Brunette got the impression from Haskell's tone that she felt some wrongdoing had occurred.

[4] Officer Brunette testified that Auburn police officers always write a report about any criminal investigation.

2 years earlier. At the condominium, Berthon looked through a window and said she thought furniture was missing. She convinced Officer Shively that he should enter the condominium to see if Compton was sick or injured. She also mentioned that Compton had a roommate. Shively knocked and announced who he was and, after receiving no response, entered through the front window. He let Berthon in through a sliding glass door. Berthon confirmed that furniture was missing, but at that point Officer Shively did not consider that fact suspicious. There were also beer cans, food, and garbage strewn around the living room and kitchen.

Berthon began noticing a strong odor in the hallway and walked toward the closed door which she identified as her aunt's bedroom. She mentioned that Compton had had a dog that was put to sleep. Compton had been unable to part with it, and Berthon wondered if the smell might be the dog's body. She tried to open the door, but it was locked. She also noticed that the edges of the door were sealed with masking tape and a towel lay across the base of the doorway. Officer Shively recognized the odor as that of decaying flesh and immediately escorted Berthon out of the condominium. According to Shively, he "didn't know what [he] had at that point" and decided to contact his supervisor, Sergeant Lee.[5]

Sergeant Lee arrived at the condominium within 10 minutes. After learning of the circumstances and "[n]ot knowing what was in there", Sergeant Lee decided to use his cellular phone to call a police technician, Bob Phillips, to photograph the door and process it. Phillips arrived at the condominium shortly after 11 a.m. According to Sergeant Lee, the situation seemed "stable" because "nothing was happening" and

---

[5]Officer Shively testified that his call to Sergeant Lee was part of the "normal, routine procedure". Gocken contends that this demonstrates that Shively did not perceive any emergency. However, Shively's testimony should be viewed in light of Sergeant Lee's testimony that it was standard procedure during a health and safety check for officers to contact their supervisors before breaking a door or otherwise damaging property to carry out the check.

he saw "no need for any haste". He had decided to call Phillips as

> [a] precaution. With the decay — the smell of decaying flesh, you don't know what you have. The information I had was a lady was missing, . . . her dog was missing. I didn't know what for sure I had there, but I didn't want to take a chance and destroy any . . . potential evidence, so to be on the safe side, I had [Phillips] called out to process the door.

As the sergeant later testified, he was not treating the situation as an emergency at that point. When later asked if he suspected a homicide had occurred, he testified:

> Well, no, suspicion's too strong a word. I mean, we [didn't] know what was there. It could have been — it could have been anything, including the — the so-called missing dog. So I just didn't know, and so we proceeded with caution.

Officer Shively and Phillips entered the condominium without a warrant. Phillips photographed the interior and removed the tape sealing the bedroom door. With Sergeant Lee's authorization, Shively and Phillips kicked open the locked bedroom door. Shively noticed a door to the right and opened it. Although it was dark inside, he recognized coagulated blood on the floor. The men immediately went outside and sealed off the condominium. No one entered again until a warrant was obtained. When the police reentered the condominium, they checked Compton's private bathroom and found her body wrapped in garbage bags and a blanket tied with cord.

From Officer Shively's perspective, he was doing a routine check on Compton's welfare, not a criminal investigation. Although he had a feeling that "maybe something was wrong" when he and Berthon found the door taped, he did not have any specific reason to believe that he was dealing with a homicide at that point. According to Shively, the events of that morning did not turn into a criminal investigation until Compton's dead body was found.

Gocken was subsequently arrested for Compton's murder after the police located him at a motel in Federal Way. Later investigation revealed, among other things, that someone had forged more than 30 of Compton's personal checks. On

June 28, 1990, Gocken was charged by information with one count of first degree murder.

Prior to trial, over defense objection, the information was amended to add eight counts of forgery. In addition, defense counsel moved to suppress the evidence found in Compton's bedroom and bathroom, arguing that the warrantless police searches violated the Fourth Amendment and the Washington State Constitution. The trial court denied Gocken's motion to suppress. It found that the June 16 search was a legitimate health and safety check, and there was no basis for Officer Brunette to assume any crime had been committed. The trial court also upheld the warrantless search on June 25 based on the exigencies created by Compton's age, her disability, and the circumstances of her apparent disappearance. Because there was no way of knowing whether Compton was ill and needed assistance until Officer Shively actually found her body, the court concluded that the search was not motivated by an "intent to arrest and seize evidence". Finally, the court held that Gocken lacked standing to challenge the search of Compton's bedroom and bathroom because his legitimate expectation of privacy did not extend to that portion of the premises.

During trial the medical examiner, Dr. Corinne Fligner, explained that when she began the autopsy the body had been wrapped in plastic garbage bags and a blanket. A towel and a ligature were tied around Compton's neck, and other ligatures tied her hands behind her back and bound her feet. Dr. Fligner also testified that the cause of death was asphyxia due to ligature strangulation, which might have been accompanied by manual strangulation.

Additional testimony from state witnesses indicated that Gocken used cocaine daily, had high bar tabs, and owed money to several people when Compton disappeared. In addition, Gocken acknowledged that he had earned no income since 1988 and sold various pieces of furniture to a store in Auburn between June 1 and June 16 for several hundred dollars. He told the store owner that the furniture had belonged to his mother who had died.

Gocken testified that he did not murder Compton but found her strangled in the condominium one night in the first part of June. When he discovered Compton's body, he "freaked out" and believed that she had been murdered by the people who supplied his cocaine supplier, Gordon Schackle, to whom he owed $800 for cocaine. Schackle had warned him that the suppliers threatened to kill Gocken if he did not pay his debt.

When he found Compton dead, Gocken feared he would be blamed for the murder. He therefore wrapped the body in plastic bags and a blanket, which he tied with rope from the laundry room, and moved it into Compton's bathroom. According to Gocken's testimony, he decided then to try to meet Schackle's suppliers and confront them with the murder. He set about doing that by going to the bar that he and Schackle frequented and flashing a lot of money around in an attempt to attract the cocaine suppliers. He acknowledged that he had forged Compton's checks and sold her furniture in order to pay his debt to Schackle and carry out his plan of catching the people he believed murdered Compton. Gocken left his clothing and other possessions in the condominium and continued to use it on occasion. On June 24 he checked into the Federal Way motel where the police later arrested him.

The jury found Gocken guilty of first degree murder and all eight counts of forgery, and the court entered judgment and sentence accordingly. Gocken now appeals.

## II
### THE SEARCHES

We first address whether the trial court correctly concluded that the warrantless searches of Compton's condominium were permissible and that Gocken lacked standing to challenge the search of Compton's bedroom and bathroom.

Both the federal constitution and our state constitution prohibit unreasonable searches. U.S. Const. amend. 4; Const. art. 1, § 7. However, there are several well-established exceptions to the warrant requirement, including the emergency exception. *State v. Loewen*, 97 Wn.2d 562, 647 P.2d 489 (1982), and cases cited therein; *State v. Lynd*, 54 Wn. App. 18, 20, 771

P.2d 770 (1989). Under that exception, the police may conduct a warrantless search "where there is no probable cause of a crime, as when an officer enters a house to give emergency medical assistance." *State v. Swenson*, 59 Wn. App. 586, 588, 799 P.2d 1188 (1990). A warrantless search based upon the emergency exception must not be primarily motivated by the officer's intent to make an arrest and seize evidence. *State v. Nichols*, 20 Wn. App. 462, 465, 581 P.2d 1371, *review denied*, 91 Wn.2d 1004 (1978). Instead,

> [t]he emergency exception to the Fourth Amendment's warrant requirement requires that the entering officer subjectively believe that an emergency exists; therefore, the officer's motivation is the linchpin in the assertion of the emergency exception as justification for a warrantless entry.

*State v. Bakke*, 44 Wn. App. 830, 837, 723 P.2d 534 (1986), *review denied*, 107 Wn.2d 1033 (1987). Further,

> [i]n order for a search to come within the emergency exception, [a reviewing court] must be satisfied that the claimed emergency was not simply a pretext for conducting an evidentiary search and instead was "actually motivated by a perceived need to render aid or assistance."

*Lynd*, 54 Wn. App. at 21 (quoting *Loewen*, 97 Wn.2d at 568).

Similarly, the police may be required to perform a warrantless search, not as a response to an immediate emergency, but as part of their function of protecting and assisting the public. *See* Utter, *Survey of Washington Search and Seizure Law: 1988 Update*, 11 U. Puget Sound L. Rev. 411, 538 (1987-1988) ("[i]f officers undertake a search in good faith for a reason other than investigating crime — for example, to aid someone who has been injured — any evidence they discover may be admissible"). As the Ninth Circuit recently observed:

> "[I]n addition to being an enforcer of the criminal law," a police officer "is a jack-of-all-emergencies.'" *United States v. Rodriguez-Morales*, 929 F.2d 780, 784 (1st Cir. 1991), *quoting* W. LaFave, *Search and Seizure* § 5.4(c), at 525 (2d ed. 1987), *cert. denied*, ___ U.S. ___, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). He is "expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an

infinite variety of services to preserve and protect community safety." *Id.* at 784-85.

*United States v. Erickson*, 991 F.2d 529, 531 (9th Cir. 1993).

When an officer believes in good faith that someone's health or safety may be endangered, particularly if that person is known to have physical or mental problems, public policy does not demand that the officer delay any attempt to determine if assistance is needed and offer that assistance while a warrant is obtained. To the contrary, the officer could be considered derelict by *not* acting promptly to ascertain if someone needed help. *See Lynd*, 54 Wn. App. at 23. So long as it is undertaken in good faith and is not motivated by an intent to arrest or search for evidence of a crime, a warrantless search conducted in order to check on an individual's health or safety is a valid exception to constitutional warrant requirements.[6] *See Cady v. Dombrowski*, 413 U.S. 433, 447-48, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973) (an officer's warrantless "caretaking" search of a vehicle not in the custody or on the premises of the owner was not unreasonable; the Fourth Amendment gives only "the general standard of 'unreasonableness' as a guide in determining whether searches and seizures meet the standard of that Amendment in those cases where a warrant is not required").

Thus, as in the case of the emergency exception, the State can demonstrate that an officer's warrantless entry is not merely a pretext to search for otherwise unavailable evidence by proving that: (1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and

---

[6]*Erickson* does not compel the opposite conclusion. In that case, the Ninth Circuit characterized an officer's investigation of a possible burglary as a "community caretaking function" and held that that function, in itself, did not justify a warrantless search of a private residence in the course of investigating a crime. 991 F.2d at 531. In contrast, the emergency exception to the warrant requirement, *Lynd*, and the health and safety check exception discussed here are limited to circumstances in which there is no probable cause to suspect a crime is being or has been committed. Because the officers involved in this case were not investigating a crime before they found Compton's body, *Erickson's* holding is inapposite.

(3) there was a reasonable basis to associate the need for assistance with the place searched. *Cf. Loewen*, 97 Wn.2d at 568; *Lynd*, 54 Wn. App. at 21; *State v. Downey*, 53 Wn. App. 543, 545, 768 P.2d 502 (1989).

In this case, Officer Shively's initial entry into Compton's condominium on June 25, 1990, was clearly intended to be a routine check on Compton's welfare.[7] He testified that he entered the condominium to determine if Compton was injured or ill. Although he was not certain "what [he] had", Berthon's concerns convinced him that Compton might have been inside in need of help. Hence, Officer Shively was motivated to enter Compton's home "by a perceived need to render aid or assistance" (*see Loewen*, 97 Wn.2d at 568), and the subjective prong of the test is satisfied as to that initial entry. Given that Compton was elderly, mentally ill, and on medication, and Berthon had been unable to contact her for several weeks, a reasonable person would also have concluded that Compton might have been injured and unable to care for herself or call for help.[8] Further, Officer Shively had a reasonable basis to associate Compton's potential need for assistance with her residence because that was where Berthon expected to find her and where she normally would be. *See Lynd*, 54 Wn. App. at 21.

Once the officers were lawfully inside the condominium performing a health and safety check, their discovery of the tape around the door, the towel and the odor emanating from the locked room falls within the plain view doctrine

---

[7]While Gocken, in his pro se brief, also challenges the constitutionality of Officer Brunette's search of Compton's condominium on June 16, 1990, and seeks to exclude all evidence relating to that search, there is no evidence to exclude.

[8]Gocken contends that the lack of an emergency situation is demonstrated by the fact that Berthon had been unable to contact Compton for more than 2 weeks. However, the passage of time from the last contact with a missing person is not the deciding factor as to whether a need for assistance exists which would justify police action. In this case, other factors, such as the fact that Compton was elderly and had mental health problems, support the conclusion that she may have been alive in her home but ill or otherwise unresponsive to phone calls or visitors.

exception to the warrant requirement. *State v. Bell*, 108 Wn.2d 193, 196-98, 737 P.2d 254 (1987).

> A "plain view" seizure is valid if the following requirements are met: "(1) a prior justification for intrusion; (2) inadvertent discovery of incriminating evidence; and (3) immediate knowledge by the officer that he had evidence before him." [*State v. Myrick*, 102 Wn.2d 506, 514, 688 P.2d 151 (1984)] (quoting [*State v. Chrisman*, 100 Wn.2d 814, 819, 676 P.2d 419 (1984)]).

As we have just demonstrated, the officers' initial entry into the condominium was clearly justified by the need to perform a health and safety check and, once inside, they could not have avoided seeing the taped door and the towel or smelling the odor of decaying flesh. Thus, the first two elements of the plain view doctrine are satisfied.[9]

As for the third element, "[a]ll that is required to satisfy the 'immediate knowledge' element is a reasonable belief that evidence is present." *Bell*, 108 Wn.2d at 197-98. Despite Officer Shively's and Sergeant Lee's somewhat equivocal testimony to the effect that they were not sure "what [they] had" when they saw the door and smelled the odor, their actions establish that they had a reasonable belief that evidence of some kind was present. As soon as he smelled the odor, Officer Shively removed Berthon from the premises. He then called his sergeant who, in turn, called the evidence technician to process the door before they broke it down. In addition, it defies common sense to conclude that Compton could have taped herself into her bedroom. Therefore, while the officers clearly did not know that they had evidence of a homicide when they saw the door and smelled the odor, they did know that they had evidence of something. Once they entered Compton's bathroom, they also knew the nature of the crime to which it applied. They then knew "what [they] had".

---

[9]As the Supreme Court held in *Bell*, it is not necessary to establish that exigent circumstances were present if the first element of the plain·view doctrine is otherwise satisfied. "[E]xigent circumstances are merely one factor to be considered in determining if the seizing officers' intrusion was justified." 108 Wn.2d at 198.

██ The expiration of approximately an hour between Officer Shively's initial entry and the other officers' reentry does not defeat application of the plain view doctrine in this case. Both Washington and federal law establish that "the later entries were 'no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence.' " *State v. Stevenson*, 55 Wn. App. 725, 731, 780 P.2d 873 (1989) (quoting *Michigan v. Tyler*, 436 U.S. 499, 511, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978); citing *Bell*, 108 Wn.2d at 198-201), *review denied*, 113 Wn.2d 1040 (1990). We therefore conclude that no warrant was required to authorize Sergeant Lee, Officer Shively and the evidence technician to reenter the condominium in order to process and photograph the door. Any evidence they obtained was admissible under the plain view exception to the warrant requirement.[10]

██ ██ As for the entry into Compton's bedroom and bathroom, we agree with the trial court that Gocken had no personal interest, and, thus, no legitimate expectation of privacy, in those areas. As *State v. Foulkes*, 63 Wn. App. 643, 647, 821 P.2d 77 (1991) aptly states:

> Fourth Amendment rights are personal rights which may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978). A defendant who does not personally claim a legitimate expectation of privacy in the area searched or property seized generally has no standing to challenge the search or seizure. *See State v. Simpson*, 95 Wn.2d 170, 174-75, 622 P.2d 1199 (1980) . . .. An individual has a " 'justifiable,' . . . 'reasonable,' or . . . 'legitimate expectation of privacy' " if that individual has manifested an actual, subjective expectation of privacy in the area searched or item seized and society recognizes the individual's expectation of privacy as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979)[.]

---

[10]We also note that, even if the evidence obtained from this portion of the search were not properly seized, its admission would be harmless beyond a reasonable doubt. The other evidence of the murder and Gocken's attempts to conceal it was overwhelming, and the photographs of the taped door added very little to the State's case against him. Under these circumstances, that evidence was inconsequential. *Myrick*, 102 Wn.2d at 515.

Gocken testified that he and Compton never had a romantic relationship and that he only entered her bedroom to get art supplies or to use the desk that he alleged was part of the "business" that he and Compton were starting. The trial judge specifically stated that she did not believe Gocken's testimony about the alleged business and concluded that he had no personal interest in Compton's bedroom and bath. On these facts, the trial court correctly held that Gocken lacked standing to challenge the search of Compton's bedroom and bathroom areas.

The judgment and sentence of the trial court are affirmed and Gocken's petition is denied.

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

PEKELIS, A.C.J., and GROSSE, J., concur.

Reconsideration denied October 6, 1993.

Review denied at 123 Wn.2d 1024 (1994).