IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80643-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DAVID MICHAEL KALAC, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — David Michael Kalac appeals his convictions for first degree murder, theft of a motor vehicle, and possession of stolen property. He argues the homicide detectives—who entered his apartment immediately after a responding sheriff's deputy found the victim's body—conducted an unlawful warrantless search. He also contends the trial court erred by continuing the trial beyond the initial 60-day time-to-trial deadline. He challenges the sufficiency of the evidence to prove premeditated intent and the trial court's refusal to give his requested manslaughter jury instructions. Finally, he maintains the trial court's exceptional 82-year sentence is unsupported by sufficient evidence and erroneously based on the amount of good time credit he might be entitled to receive.

Citations and pin cites are based on the Westlaw online version of the cited material.

Given the Supreme Court's ruling in State v. Schierman, 192 Wn.2d 577, 438 P.3d 1063 (2018), we conclude any possible error in refusing to instruct the jury on the lesser charge of manslaughter was harmless. The trial court committed no other errors, and we affirm Kalac's convictions and sentence. In light of this ruling, we decline to address the State's cross appeal. We remand solely for the trial court to strike the imposition of fees and nonrestitution interest from the judgment and sentence.[1]

## FACTS

On the afternoon of November 4, 2014, police received a 911 call reporting that Amber Coplin had been found dead in her Port Orchard apartment bedroom. Amber[2] lived there with her 13-year-old son, B.C.,[3] and Kalac. When responding officers arrived, they found Amber's husband, Paul Coplin,[4] standing outside the apartment with B.C. When the responding sheriff's deputy entered the apartment, he found Amber's body on the bed under a blanket. She was cold to the touch and obviously dead.

As the investigation unfolded, police learned that on the evening of November 3, 2014, Amber and Kalac had argued, and Amber asked Kalac to leave. Amber came into B.C.'s bedroom to ask for a sleeping bag, which B.C. assumed Kalac would use to sleep on the couch. B.C. overheard the arguing

---

[1] The State concedes a narrow remand is necessary for this purpose.

[2] We use first names where necessary to differentiate persons with the same surname. No disrespect is intended.

[3] We use B.C.'s initials to maintain his anonymity.

[4] Amber and Paul were still married but had been amicably separated for several years. They had three other sons, other than B.C., all of whom lived with Paul.

escalate and came out of his bedroom to check it out. He saw Amber and Kalac in the living room with the sleeping bag on the couch.

The next morning, November 4, 2014, B.C. got up around 6:00 a.m. to get ready for school. Generally, Kalac would be up and getting ready for work at the same time, but B.C. noticed that neither Kalac nor his belongings were there. The door to Amber's bedroom, which she shared with Kalac, was closed, as was normal for a weekday morning; Amber typically got up for work after B.C. left for school.

While at school, B.C. became ill—he "had a weird feeling in [his] stomach . . . [l]ike something was wrong"—so he texted Amber. When she did not respond, he texted Paul and asked him to pick him up from school. Although B.C.'s school was minutes from the apartment, the school would not permit him to leave without a parent. Paul picked B.C. up from school around 11:30 a.m., took him to get some juice, and then dropped him at home without coming into the apartment. Amber's bedroom door was still closed.

After a nap, a shower, and a snack, B.C. went by Amber's room and noticed an odd "stench." When he opened the door, he saw what appeared to be his mother's body covered by blankets, and her face covered by a pillow. He tried to turn on the light, but it was not working. B.C. saw her "stuff" strewn around the room—coins, her emptied purse, and her dentures on the floor. He then saw Amber's ID on the pillow covering her face, with the word "dead" written on it. Thinking Amber might be passed out from alcohol consumption, he climbed onto the bed to rouse her. He touched Amber—who was a light sleeper—and when

- 3 -

she did not stir, he "freak[ed] out." He texted Paul, telling him something was wrong with Amber. He was not sure if Amber was alive or dead.

Paul arrived within 10 minutes with his son, A.C., and went into the bedroom. He initially saw what looked like a pile of blankets on the bed. He then saw Amber's driver's license with the word "dead" written on it on a pillow over her face. Paul lifted the pillow and found Amber underneath—dead. Paul fled the bedroom, hurried the boys out of the apartment, and called 911.

Kitsap County Sheriff Deputy Rice responded to the call. He spoke briefly to Paul, entered the apartment, and found Amber's body lying on the bed with the blanket pulled up to her chin and blood coming from her nose. She was cold to the touch and obviously dead. Medics entered with him and confirmed Amber was dead. After they left, Deputy Rice did a sweep of the bedroom and the rest of the apartment looking for additional victims and making sure the scene was secure.

Deputy Rice heard over his radio that Detectives Birkenfeld and Gundrum had arrived so he left the apartment to brief them on what he had seen. The detectives then entered to assess the scene, following Deputy Rice's footsteps. Detective Birkenfeld saw a framed print on Amber's bedroom wall, on which someone had written the phrase "she killed me first." The window blinds were down, and the words "bad news" had been written on them. The writing on Amber's license, the framed print, and the blinds all appeared to have been done with the same black permanent marker.

The detectives observed Amber's face was bruised and bloody. They saw what appeared to be blood stains on the wall at the head of the bed. And they

found a half-set of dentures on the floor. Near the window, they saw a purse on the floor with its contents dumped out. The detectives concluded the death was likely a homicide so they left the apartment to obtain a search warrant.

After the search warrant was granted, they began processing the scene. They removed the bedding covering Amber's body and saw other injuries, including ligature marks around her neck and bite marks on her breasts. Profane comments were written over her body in handwriting that appeared similar to the writing on the walls. On the nightstand, they found paperwork, from the Kitsap Public Health District, indicating Amber had recently undergone an abortion.

Upon learning that Kalac could not be found and that Amber's gold Ford Focus was missing, Detective Birkenfeld and his colleagues focused their investigation on Kalac's actions on November 4 and 5, 2014.

Law enforcement subsequently recovered several photographs of Amber— nude and dead, lying on her bed—on Kalac's cell phone. The photographs were date and time stamped 1:07 a.m. and 1:09 a.m. on November 4. A "Good to Go" invoice showed that Kalac, driving Amber's car, crossed the Tacoma Narrows Bridge at 5:33 a.m. that same morning. At 6:20 a.m., Kalac texted his employer informing him he had done something bad that would make the news. He texted a friend shortly after noon telling her that he had "f***** up really really bad last night" and would be in prison or dead by the end of the day. Kalac told his friend he was turning off his phone so he could not be tracked.

Around 1:00 that afternoon, security camera footage showed Kalac entering a Cash America and pawning a laptop computer for $125. He then went to a

nearby Albertson's store to purchase a 1.75 liter of vodka and orange juice. Kalac then drove to Chehalis, stopping at a Walmart at approximately 2:30 p.m., where security camera footage showed him purchasing a BB pistol and ammunition. The BB gun was a realistic replica of a Beretta-style semi-automatic firearm.

After purchasing the gun, footage showed Kalac sitting in the Walmart parking lot for about 30 minutes. During that time, Kalac uploaded the pictures he had taken of Amber's body to 4chan, an image-based Internet bulletin board. In the commentary accompanying the pictures, Kalac wrote, "Turns out its way harder to strangle someone to death than it looks on the movies." He wrote, "She fought so Damn hard." He then told anyone following the thread to

> Check the news for port orchard, Washington in a few hours. Her son will be home from school soon. He'll find her, then call the cops. I just wanted to share the pics before they find me. I bought a bb gun that looks realistic enough. When they come, I'll pull it and it will be suicide by cop.

Kalac apparently made his way to Portland, Oregon, where he spent several hours on the evening of November 4 at a local bar. Then, at approximately 1:00 a.m. on November 5, police in Portland, Oregon, spotted the missing gold Ford Focus and, with several U.S. Marshals participating, conducted a high speed car chase until Kalac eluded them. They discontinued the chase on Barbur Boulevard near the Barbur transit center. Police later recovered a transit ticket with Kalac's belongings, indicating he purchased the ticket at 10:40 a.m. on the morning of November 5, 2014. Between 4:00 p.m. and 5:00 p.m. that afternoon, police found Amber's car abandoned in a parking lot near where the police chase had ended.

At approximately 8:45 p.m. that evening, Kalac emerged from a wooded area near a transit center in Wilsonville, Oregon, and turned himself in to a Clackamas County Sheriff's deputy who was on patrol in the area. Deputies discovered an abandoned transient camp in the woods, and found a box spring on which Kalac had written "Dave's last stand," with a black permanent marker. They found the BB gun Kalac purchased in Chehalis resting on the box spring, and a note, also written with a black permanent marker, which read "I killed Amber Coplin. I strangled her with my hands then a shoelace. I had no reason other than I was drunk and she pissed me off. Running from the cops was so fun."

The State charged[5] Kalac with first degree murder, theft of a motor vehicle, and second degree possession of stolen property. After the trial court granted the State's motion to continue the trial beyond the initial 60-day time-to-trial deadline to facilitate processing evidence and to confirm experts to testify at trial, Kalac moved to suppress evidence the detectives gathered inside the apartment he shared with Amber. The trial court denied the motion to suppress.

At trial, Kalac's counsel conceded Kalac committed the homicide. Kalac did not dispute that he and Amber fought that night. He recalled being on top of Amber in the bedroom and having his hands around her throat that night. Kalac also had a vague memory of pulling a blanket up over Amber's head. He admitted that the handwriting on the framed print, the blinds, and Amber's body looked like his handwriting. And he conceded he would have been angry had Amber told him she had aborted his baby, although he had no recollection of her doing so. Kalac

---

[5] Other charges were dismissed before trial and after the State rested its case.

testified that he could not deny killing Amber, stating that "based on what I've seen so far, it looks like I did it." He also stated he had no memory of whether Amber was dressed or undressed when he killed her. Kalac admitted that by 6:20 a.m. on November 4, 2014, when he texted his boss and said "You'll see me in the news," he remembered what he had done approximately six hours before.

Kalac also recalled driving Amber's car in the rain, and he admitted he went to Cash America in Olympia and to the Chehalis Walmart because he recognized himself in the surveillance videos but, again, claimed he had no recollection of it. But he admitted, despite his faulty memory, he must have been able to formulate a plan to pawn the computer to get money and to purchase a BB gun.

Kalac similarly recalled driving in Portland, and he had a vague recollection of an "exhilarating experience" during the police chase. He also recalled being on the MAX, the Portland light rail, and someone waking him up to tell him they were at the end of the line. The Wilsonville transit center, where Kalac turned himself in, is a light rail station. Kalac did not recall entering the nearby woods but told examining psychologists he recalled sitting on a box spring, drinking vodka, and taking 20 to 25 pills of trazodone. He remembered waking up in the cold and being surprised because he thought he had taken a bottle of sleeping pills.

Kalac's defense to the murder was diminished capacity. His expert, Dr. David Dixon, testified that Kalac suffered from an organic brain syndrome caused by Kalac's extensive and severe alcohol use disorder, thereby diminishing his capacity to premeditate.[6]

---

[6] Kalac offered Dr. Dixon's testimony to establish that Kalac could not premeditate, making him not guilty of murder in the first degree, and that Kalac lacked the capacity to form the intent to murder,

The jury convicted him of all charges and found two aggravating circumstances—first, the murder involved a destructive and foreseeable impact on persons other than the victim, and second, Kalac displayed an egregious lack of remorse. The jury also determined each of the three crimes were committed against a member of Kalac's household, making them domestic violence convictions.

Kalac's standard range, based on an offender score of 8, was 370 to 493 months. The trial court imposed an exceptional sentence of 984 months (82 years) on the murder conviction, with standard range sentences on the remaining offenses to run concurrently. The court concluded that the jury's findings on the two aggravating circumstances were substantial and compelling reasons to impose an exceptional sentence.

Kalac appeals his convictions and the exceptional sentence for his murder conviction.

ANALYSIS

A. CrR 3.6 Motion to Suppress

Kalac challenges the constitutionality of the homicide detectives' entry into the apartment he shared with Amber. He contends Detective Birkenfeld's and Detective Gundrum's warrantless entry after Deputy Rice had completed his safety

---

making him not guilty of murder in the second degree. After an evidentiary hearing, the trial court ruled that Dr. Dixon could testify that Kalac's alcoholism and resultant brain disorder impacted his ability to premeditate but concluded that Dr. Dixon's testimony was insufficient to establish that Kalac lacked the capacity to form the general intent required for second degree murder. The court modified the diminished capacity instruction to limit it to premeditation. Kalac has not assigned error to the court's evidentiary ruling relating to the scope of Dr. Dixon's testimony or to the diminished capacity instruction.

sweep was unlawful and the evidence obtained pursuant to the search warrant should have been suppressed. We disagree.

Kalac concedes that Deputy Rice lawfully entered the apartment under the community caretaking exception—he was responding to a 911 call reporting that someone in the apartment appeared to have been beaten and may be dead. Under State v. Bell, 108 Wn.2d 193, 737 P.2d 254 (1987), and State v. Stevenson, 55 Wn. App. 725, 780 P.2d 873 (1989), the detectives' subsequent entry to observe evidence Deputy Rice had seen in plain view did not exceed the scope of Deputy Rice's lawful entry and was therefore lawful. Because Deputy Rice had the authority to seize any evidence of the crime in plain view without a warrant, so too could the homicide detectives. We conclude the search warrant was lawfully obtained and the trial court did not err in denying Kalac's motion to suppress the evidence seized from the apartment.

1. Relevant Facts

The trial court found that Paul called 911 at 3:26 p.m. on November 4, 2014, reporting finding Amber's bloody and beaten body in her bedroom in the apartment she and Kalac shared. Deputy Rice arrived five minutes later, and Paul told him what he had seen in the apartment and where to find Amber's body. Deputy Rice entered the apartment, passed through the living room, and entered the bedroom where Amber lay dead.

Several minutes later, medics arrived to see if Amber needed medical assistance; they did not touch her body. Deputy Rice touched Amber to check for signs of life, and when he found none, the medics left. Then Deputy Rice

performed a quick security sweep of the rest of the apartment to search for other possible victims or suspects. He did not touch anything except the doors. Specifically, his path within the apartment consisted of "entering into and through the living room, crossing the bedroom threshold, down both sides of the bedroom bed, and back out into the living room to the son's bedroom, back out to the living room again, and then into the kitchen and bath."

"Deputy Rice started to leave the apartment once he heard Detectives Birkenfeld and Gundrum outside because he wanted to brief them on the scene as patrol deputies do not process scenes, but instead yield to the detectives when they arrive." Deputy Rice met the detectives at the front door threshold and told them the path he took through the apartment, Amber's condition, and other evidence he observed in plain view. Deputy Rice told Detective Birkenfeld he did not move anything in the apartment. The detectives retraced Deputy Rice's path into the apartment and to the bedroom to observe the evidence Deputy Rice had seen in plain view. No items were seized during either entry.

As lead detective, Detective Birkenfeld gathered information from other law enforcement agents at the scene to support a search warrant application for the apartment. Detective Birkenfeld based the search warrant application on his personal observations inside the apartment and on information gathered from the other authorities on the scene, including Deputy Rice. He did not describe Deputy Rice's initial entry into the home in his search warrant affidavit. Kalac does not challenge any of these findings of fact.

The trial court concluded the warrant exception applicable to "emergency situations, which includes discovery of a crime scene," applied to Deputy Rice's initial entry, making that entry lawful because Deputy Rice "arrived on the scene of a reported homicide and went inside to make a prompt search of the area to see if there were other victims or suspects on the premises." It further concluded that because Detective Birkenfeld's movements matched those of Deputy Rice, Detective Birkenfeld did not expand the scope of Deputy Rice's initial search. Because Detective Birkenfeld's entry did not exceed the scope of Deputy Rice's initial lawful entry, the court concluded it was a continuation of Deputy Rice's entry. Finally, the trial court concluded that omitting from the search warrant application the fact of Deputy Rice's initial entry did not affect the warrant's validity, and the "four corners of the warrant . . . suppl[ied] the requisite probable cause necessary for the search that did in fact occur."

### 2. Standard of Review

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution prohibit an unreasonable search and seizure without a warrant, unless one of the few exceptions to the warrant requirement applies. State v. Rankin, 151 Wn.2d 689, 695, 92 P.3d 202 (2004). The State bears the burden to show that a warrantless search falls within one of these exceptions. State v. Boisselle, 194 Wn.2d 1, 12, 448 P.3d 19 (2019). Because Kalac did not assign error to any of the trial court's findings of fact, our review focuses on a de novo determination of whether the trial court derived proper

conclusions of law from those findings. State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

"'A plain view search' occurs when law enforcement officers '(1) have a valid justification to be in an otherwise protected area and (2) are immediately able to realize the evidence they see is associated with criminal activity.'"[7] State v. Ruem, 179 Wn.2d 195, 200, 313 P.3d 1156 (2013) (quoting State v. Hatchie, 161 Wn.2d 390, 395, 166 P.3d 698 (2007)). "[T]he plain view doctrine is formulated identically under the state and federal constitutions." Bell, 108 Wn.2d at 199. Kalac suggested at oral argument that Bell did not analyze article I, section 7 separately from the Fourth Amendment but conceded in a subsequent correction that Bell did in fact do so. Accordingly, we apply the plain view analysis that applies under the federal constitution. State v. O'Neill, 148 Wn.2d 564, 582, 62 P.3d 489 (2003); see also Nelson v. McClatchy Newspapers, Inc., 131 Wn.2d 523, 538, 936 P.2d 1123 (1997) (failure to conduct a Gunwall[8] analysis or show why the state constitutional provision should be interpreted differently than the federal results in court interpreting the state constitutional clause coextensively with its parallel federal counterpart); Justice Charles W. Johnson & Justice Debra L. Stephens, Survey of Washington Search and Seizure Law: 2019 Update, 42 SEATTLE U.L. REV. 1277, 1409-11 (2019) (discussing plain view exception).

---

[7] Traditionally, inadvertent discovery was a third requirement. State v. Bell, 108 Wn.2d 193, 196, 737 P.2d 254 (1987). That element is no longer required under either the Fourth Amendment or our state constitution. Horton v. California, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); State v. Goodin, 67 Wn. App. 623, 627-28, 838 P.2d 135 (1992); see also State v. Hudson, 124 Wn.2d 107, 114 n.1, 874 P.2d 160 (1994).

[8] State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986).

3. Analysis

Kalac concedes that Deputy Rice's initial entry into the apartment was lawful and that he would have been justified to seize items in his plain view. Mincey v. Arizona, 437 U.S. 385, 393, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) ("[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities."); Stevenson, 55 Wn. App. at 729-30.

Deputy Rice's testimony at the CrR 3.6 hearing supports the conclusion that his entry was authorized under the community caretaking warrant exception.[9] He entered the apartment and Amber's bedroom to "check the status of the female, see if she needed aid, see if she was still alive or not." After confirming Amber's death, Deputy Rice did a quick security sweep of the rest of the apartment for "[c]ommunity caretaking, safety sweep, making sure nobody else was in the residence, nobody else was harmed, no suspects were in there, officer safety."

Kalac contends, however, that the subsequent entry by two homicide detectives, Detectives Birkenfeld and Gundrum, was unlawful because the emergency Deputy Rice had entered the apartment to address was over. But the plain view doctrine does not require that the officer who initially sees the evidence of a crime conduct the actual seizure. Stevenson, 55 Wn. App. at 730; see also Michigan v. Tyler, 436 U.S. 499, 511, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978). Nor

---

[9] The community caretaking exception to the warrant requirement encompasses situations requiring emergency aid. State v. Harris, 9 Wn. App. 2d 625, 630, 444 P.3d 1252 (2019). Under this exception, "police may enter a dwelling . . . if they have a reasonable belief that there is an immediate need for their assistance for the protection of life or property, the search is not primarily motivated by an intent to arrest and seize evidence, and there is probable cause to associate the emergency with the place to be searched." 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE & PROCEDURE § 2734, at 649 (3d ed. 2004).

does it preclude an officer who initially sees evidence of a crime from enlisting others to help in collecting evidence in plain view. Stevenson, 55 Wn. App. at 730.

In State v. Bell, sheriff's officers seized material from an illegal marijuana grow after fire fighters discovered it while checking an attic to ensure that a reported fire was completely extinguished. 108 Wn.2d at 194-95. Bell argued the sheriffs' seizure violated his constitutional rights in two ways—one, "fire fighters needed a warrant to seize the evidence because exigent circumstances no longer existed once the fire was extinguished," and two, "the sheriff's officers needed a warrant to enter Bell's house and take charge of the seizure." Id. at 195.

Our Supreme Court rejected both arguments, concluding the State established both requirements of a plain view seizure. Id. at 196. First, the fire fighters' entry into the attic was justified; they were there to extinguish a fire and then to ensure that it did not rekindle, that there were no additional fires, and to ventilate the building. Id. at 197. And second, the fire fighters were immediately aware they had evidence before them. Id. They did not use the plain view doctrine to conduct a general exploratory search for incriminating evidence. Id.

Bell argued because there was plenty of time to obtain a search warrant, the seizure was unconstitutional. Id. at 198. He argued warrantless seizures should be held unconstitutional unless exigent circumstances exist throughout the duration of the search and seizure. Id. The Court disagreed, stating that because plain view alone satisfies constitutional privacy safeguards, a "search can be upheld under the plain view doctrine in the absence of exigent circumstances," as long as there is a lawful justification for the original intrusion. Id. at 198-99. A valid

exception to the warrant requirement can satisfy the requirement that the initial police intrusion be lawful. Id. at 199 (quoting State v. Johnson, 17 Wn. App. 153, 158, 561 P.2d 701 (1977)).

The Court also held that because the fire fighters had lawfully discovered evidence of criminal activity under the plain view doctrine, it was unnecessary for the sheriff's office to obtain a search warrant to complete the search and seizure simply because it was a separate state agency. Id. at 201. The Court reasoned, "Once the privacy of the residence has been lawfully invaded, it is senseless to require a warrant for others to enter and complete what those already on the scene would be justified in doing." Id. It clarified that when continuing the initial entry, the subsequent entry cannot exceed the scope of the earlier intrusion, absent a warrant or another warrant exception authorizing a more thorough or wide ranging search. Id. & n.6; see also Stevenson, 55 Wn. App. at 732.

Bell is analogous. Here, Kalac conceded Deputy Rice's initial entry was lawful. During Deputy Rice's lawful presence in the apartment, he saw evidence in plain view, indicating that Amber's death was likely a homicide. He described this evidence to the detectives, who then entered the apartment to verify what he saw. They followed in his footsteps and did not look into any rooms other than the rooms in which Deputy Rice had searched. They did not open any closet doors, dresser drawers, or closed containers. They merely used their observations of the evidence they and Deputy Rice saw in plain view to obtain a search warrant. The scope of their search was no different or broader than the one conducted by Deputy Rice. Their actions were arguably less intrusive than the sheriffs' actions

in Bell because they did not seize any evidence until after they had obtained a search warrant.

Kalac cites no authority for the proposition that reentry by another law enforcement officer to confirm what was in plain view and to use those observations to obtain a warrant is per se unlawful. When officers' later entries are no more than a continuation of the first and do not exceed the scope of the earlier entry, the lack of a warrant does not invalidate the resulting seizure of evidence. Tyler, 436 U.S. at 511; see also Stevenson, 55 Wn. App. at 731 ("As the Bell court observed, once the privacy of the residence lawfully has been invaded, it is senseless to require a warrant for others to enter and complete what those already on the scene would be justified in doing."). Thus, it logically follows that the detectives' subsequent entry in this case to make observations to obtain a warrant for the full search was permissible.

The federal cases on which Kalac relies are distinguishable. In Mincey v. Arizona, the United States Supreme Court held a "murder scene exception" unconstitutional in the absence of exigent circumstances. 437 U.S. at 395; see also Flippo v. West Virginia, 528 U.S. 11, 12, 120 S. Ct. 7, 145 L. Ed. 2d 16 (1999) (unauthorized murder scene search where no observable evidence in plain view of responding officers); Thompson v. Louisiana, 469 U.S. 17, 18, 105 S. Ct. 409, 83 L. Ed. 2d 246 (1984) (same). But the State here did not rely on a generic murder scene exception to justify the detectives' search of the apartment. It relied on the community caretaking exception to justify Deputy Rice's initial entry and the plain view doctrine to justify the homicide detectives' subsequent entry. See Stevenson,

55 Wn. App. at 732 n.5 (distinguishing Mincey as involving the unlawful seizure of incriminating evidence from concealed places rather than the lawful seizure of evidence in plain view).

State v. Schroeder, 109 Wn. App. 30, 32 P.3d 1022 (2001), is also distinguishable. In that case, officers responding to a suicide exceeded the community caretaking function "when they conducted a warrantless search for the deceased's identification, after his cohabitant had identified him, beyond what they could see in plain view in the room where the deceased's remains lay." Id. at 34. Unlike Schroeder, the officers here did not exceed the boundaries of the community caretaking exception because they obtained a warrant before seizing any evidence from the apartment or searching for evidence not otherwise in plain view.

Nor is Kalac's reliance on State v. Boisselle helpful. In Boisselle, our Supreme Court clarified the emergency aid function of the community caretaking exception and concluded that the officers' warrantless search was a pretext[10] for a criminal investigation because "the officers had significant suspicions of criminal activity, the officers' entry was motivated by the desire to conduct an evidentiary search, and there was no present emergency." 194 Wn.2d at 9. Specifically, the officers responded to 911 calls reporting a crime at a duplex; they sought to confirm whether a crime had been committed when they smelled something that could be a decomposing body; when they saw inside the apartment, the signs of a struggle

---

[10] "A pretextual search occurs when officers rely on some legal authorization as a mere pretense 'to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement.'" Boisselle, 194 Wn.2d at 15 (alteration in original) (quoting State v. Ladson, 138 Wn.2d 343, 358, 979 P.2d 833 (1999)).

and missing carpet could have been due to a crime; the officers connected a missing person and the suspect in the missing person case to the duplex after consulting with a detective assigned to the missing person case; and lastly, almost two hours later, they finally entered the duplex. Id. at 15. "Because the officers had significant suspicions of criminal activity, the officers were conducting a criminal investigation, and there was no present emergency, it was objectively unreasonable for the officers to conduct a warrantless search of [the] home," and therefore, the warrantless search was pretextual and did not fall under the emergency aid function of the community caretaking exception. Id. at 16-17.

Because Kalac concedes the lawfulness of Deputy Rice's initial entry, Boisselle is inapplicable to this case. There is no basis for contending—and Kalac does not argue—that Deputy Rice's entry was a pretext for a criminal investigation. Moreover, Boisselle did not address the plain view exception. Thus, the case does not inform our analysis of whether Detectives Birkenfeld and Gundrum were authorized to enter on the heels of Deputy Rice for the purpose of looking at the evidence in plain view and using their observations to obtain a search warrant.

The unchallenged findings of fact support the trial court's conclusion that the detectives' entry did not exceed the scope of Deputy Rice's initial emergency aid search. It was a lawful continuation of Deputy Rice's entry and the warrant—based on Detective Birkenfeld's observations and reports from other authorities on scene—was valid and supported by probable cause. We conclude the trial court did not err by denying Kalac's motion to suppress.

B. Time-to-Trial Deadline

Kalac next argues that good cause did not exist to continue his trial date beyond the original 60-day time-to-trial deadline of January 13, 2015 and, as a result, the court violated his speedy trial rights. He maintains the trial court abused its discretion in continuing the trial because neither the State's failure to commit sufficient resources to the Washington State Patrol (WSP) crime lab nor the timing of the crime in November and vacation schedules over December holidays was "good cause" or an "unforeseen circumstance" justifying a continuance. We conclude the trial court did not abuse its discretion in continuing the trial.

1. Relevant Facts

Kalac was arraigned on November 14, 2014. The court set his trial date for January 5, 2015, within his 60-day time-to-trial expiration of January 13, 2015. On December 5, 2014, the State indicated a possible delay in receiving evidence from Kalac's cell phone. It notified the court that it had sent Kalac's phone to the FBI crime lab when WSP encountered difficulties accessing information on the phone, and the FBI also experienced difficulties and told the State it could take "up to four months because this is an issue of first impression and because of the inability to get into that type of phone."

On December 19, 2014, the State asked for a continuance beyond the January 13, 2015 time-to-trial deadline for multiple reasons. First, it represented to the court that it had not obtained all the necessary evidence from Kalac—including his DNA, fingerprints, and handwriting samples—until December 12, 2014. After sending those samples to the DNA crime lab in Seattle, a supervisor

informed prosecutors that holiday schedules left the office short staffed, meaning it likely could not assign a technician to the case until January. And even once it assigned a technician to perform the analysis, it would take an additional couple of weeks to get the results. Second, it informed the court that the FBI was still processing Kalac's phone. Third, it notified the court that the toxicology report could also be delayed another several weeks and the coroner did not know when it would be ready. Finally, the State noted that its potential strangulation expert had not confirmed his availability, but once he did, the State wanted to allow Kalac's counsel time to interview him. Because it also needed lead time to subpoena witnesses and start arranging for times to ensure witness availability, it proposed a new trial date for the end of March.

The court continued the hearing on the State's motion to December 29, 2014 to give Kalac's counsel an opportunity to respond. At that hearing, the State identified additional reasons for delaying trial. It informed the court it had not confirmed a strangulation expert and it needed to assess the full extent of the extensive crime scene analysis that WSP had provided. Second, the doctor performing a forensic dental analysis had not begun his analysis, and he was unavailable for testimony for large blocks of time in January and February, including January 5 through January 18. The State argued all of this evidence— bite-mark and handwriting analyses, expert testimony on strangulation, and Kalac's behavior before and after Amber's death—was material to proving premeditation. In addition, the cell phone evidence was material because it connected Kalac to the crime.

Kalac argued there was no case law allowing a continuance "based on a presumption that [the yet-to-be-tested evidence] might be helpful to one side down the road."

Recognizing the parties' competing desires—the State's need to prepare its evidence to try Kalac for murder and Kalac's right to a speedy trial under the rules—the court concluded the State had exhibited due diligence in its efforts to obtain and analyze the relevant evidence. It agreed the evidence was material and found good cause to continue the trial. It scheduled the trial for March 2, 2015, with a speedy-trial deadline of March 31, 2015.

On January 12, 2015, the State informed the court and defense counsel that because test results would be available earlier than originally anticipated, it could be ready for trial as early as January 26, 2015. But Kalac preferred to keep the March 2nd trial date to give him sufficient time to review all the incoming test results.

In confirming the March 2, 2015 trial date, the court stated:

> I am also mindful that it's extremely unusual for a defendant to object to a continuance of the initial trial date in cases of this type where there is a large amount of forensic evidence to be evaluated and expert witnesses to be consulted.

> Here it occurs to me that the Defense likely objected because of the inability of the State to be able to present its case which, on January 5th, if the case was going to go forward, would have, in essence, gutted the State's case because of the unavailability of forensic evidence and expert testimony.

> So while that would have given the defendant what is, in the [c]ourt's opinion, a tremendous strategical [sic] advantage, it would have been woefully unfair to the prosecution to force the prosecution into a position of needing to bring a trial before all of the forensic

affidavit evidence is evaluated or before expert witnesses are able to render their opinions.

## 2. Standard of Review

A defendant who is detained in custody must be brought to trial within 60 days of arraignment. CrR 3.3(b)(1), (c)(1). Generally, a charge not brought to trial within the time limits of CrR 3.3 must be dismissed with prejudice. CrR 3.3(h). CrR 3.3(e), however, identifies time periods the trial court may exclude from the 60-day time-to-trial computation, including under CrR 3.3(e)(8) for "[u]navoidable or unforeseen circumstances affecting the time for trial beyond the control of the court or of the parties." Another exclusion is any "[d]elay granted by the court pursuant to section (f)." CrR 3.3(e)(3). CrR 3.3(f)(2) gives the trial court the discretion to grant a continuance on motion of the court or a party "when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." If a period of time is excluded from the time-to-trial computation, then "the allowable time for trial shall not expire earlier than 30 days after the end of that excluded period." CrR 3.3(b)(5).

We review an alleged violation of the speedy trial rule de novo. State v. Kenyon, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009). The trial court's decision to grant a continuance, however, is reviewed for an abuse of discretion. Id. (quoting State v. Downing, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004)). Once a continuance is properly granted, the trial court has discretion in selecting the new trial date. State v. Flinn, 154 Wn.2d 193, 200-01, 110 P.3d 748 (2005). A court abuses its discretion if its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. Kenyon, 167 Wn.2d at 135.

3. Analysis

First, Kalac challenges the trial court's finding[11] that Amber's homicide and "the resulting amount of forensic material sent to the crime lab for analysis could not have been foreseen when lab employees had scheduled their leave for the Thanksgiving and Christmas Holidays." He argues the state's failure to allocate enough funding to crucial criminal justice resources is an insufficient reason to grant a trial continuance. But the cases on which Kalac relies are distinguishable because the records in those cases supported findings of administrative shortfalls or inadequate funding that caused staffing shortages. State v. Mack, 89 Wn.2d 788, 794, 576 P.2d 44 (1978) (docket congestion and jury selection not "good cause" for trial continuance beyond the 60-day time-to-trial deadline); State v. Wake, 56 Wn. App. 472, 475-76, 783 P.2d 1131 (1989) (insufficient staff to process drug cases not unavoidable circumstances beyond the State's control); State v. Kokot, 42 Wn. App. 733, 737, 713 P.2d 1121 (1986) (without a record of courtrooms in use or availability of visiting judges to hear criminal cases in unoccupied courtrooms, a continuance granted for court congestion is an abuse of discretion).

Unlike these cases, the record here supports the trial court's conclusion that staffing shortages were unavoidable because of holiday vacations, not inadequate state funding. As the State persuasively argues, the crime lab is not a retailer who, anticipating a holiday rush, can hire extra employees to mitigate the extra work

---

[11] Kalac presented no argument in his opening brief on the other findings he challenged. Accordingly, we consider those assignments of error waived. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

during the holiday season. There is no indication the State delayed in seeking the continuance. It made its motion on December 19, 2014, as soon as it recognized the problem and over two weeks before the January 5, 2015 trial date. See State v. Howell, 119 Wn. App. 644, 648-49, 79 P.3d 451 (2003) (discussing Wake and State's requested continuance one day before trial when it was aware of unavailability two weeks before).

The record supports other unforeseeable reasons for the needed trial delay. The State cited the FBI's problems processing Kalac's phone and the State's difficulty securing a strangulation expert on such a short timeframe. The record supports a finding that neither were within the State's control. It also sought time for the prosecutors to prepare for trial, a legally valid basis for a continuance. Flinn, 154 Wn.2d at 200 (granting continuance based on good cause for State to prepare for Flinn's diminished capacity defense); see also State v. Cauthron, 120 Wn.2d 879, 910, 846 P.2d 502 (1993) (no prejudice to defendant where continuances were necessary to obtain the required evidence), overruled in part on other grounds by State v. Buckner, 133 Wn.2d 63, 941 P.2d 667 (1997). And the State raised the unavailability of material state witnesses, another valid reason for delaying trial when there is a valid reason for the unavailability. State v. Day, 51 Wn. App. 544, 549, 754 P.2d 1021 (1988). The record supports the trial court's findings that there were justifiable reasons for continuing Kalac's trial past his speedy trial date.

Second, Kalac contends his trial date itself was within the State's control because it had discretion to charge him when it did. He cites RCW 9.94A.411(2),

which provides, "Crimes against persons will be filed if sufficient admissible evidence exists, which, when considered with the most plausible, reasonably foreseeable defense that could be raised under the evidence, would justify conviction by a reasonable and objective fact finder." He argues the State had sufficient evidence—based on the written confession found in the forested area in Oregon and the online confessions and communications—and did not need the additional evidence. This argument is not well taken. At the time of the continuance, Kalac had not yet admitted that he wrote the confession note or that he had killed Amber. These concessions occurred much later in the case.

And as the State indicated to the trial court in January 2015, it needed the evidence to prove premeditation, not just the identity of the perpetrator. The State initially charged Amber's murder as second degree. After apprehending Kalac and furthering its investigation, the State amended the charges to first degree premeditated murder. The strangulation expert, as discussed below, was the State's key evidence of Kalac's premeditation.

We conclude the trial court did not abuse its discretion in granting the State's request to continue the trial date. The decision was not manifestly unreasonable, based on untenable grounds, or based on untenable reasons.

C. Sufficiency of the Evidence of Premeditation

Next, Kalac contends the State failed to present sufficient evidence to prove he premeditated Amber's death. Because the State presented circumstantial evidence that Kalac deliberated and reflected before and during the act of

strangling Amber, the State presented sufficient evidence to prove premeditation beyond a reasonable doubt.

To satisfy the Fourteenth Amendment's due process guarantee, the State "bears the burden of proving every element of every crime beyond a reasonable doubt." U.S. CONST. amend. XIV; State v Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). In considering a sufficiency of the evidence challenge, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Condon, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (quotations omitted). Evidence sufficiency challenges admit the truth of the State's evidence and all reasonable inferences that can be drawn from it. Id.; see also State v. Stewart, __ Wn. App. 2d __, 457 P.3d 1213, 1215 (2020). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. Stewart, 457 P.3d at 1215-16.

The challenged element here is premeditation, the only element separating first degree murder from second degree murder. See State v. Brooks, 97 Wn.2d 873, 876, 651 P.2d 217 (1982). Premeditation "encompasses the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." Id. But statutorily, premeditation "must involve more than a moment in point of time." RCW 9A.32.020(1). For the act to constitute first degree murder, "the objective or purpose to take human life . . . must have been formed after some period of deliberation, reflection or weighing in the mind." Brooks, 97 Wn.2d at 876. Premeditation may be proved by circumstantial

evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial. State v. Pirtle, 127 Wn.2d 628, 643, 904 P.2d 245 (1995).

The evidence supports the jury's conclusion that Kalac premeditated Amber's murder. Dr. John Lacy with the Pierce County Medical Examiner's Office, testified that, in his opinion, Amber died of a combination of manual and ligature strangulation. He identified ligature furrows around Amber's neck made by a very thin cord and concluded, based on the pattern of the ligature's markings, that the ligature had been looped at least twice around her neck. He further testified the absence of a ligature furrow on the back of Amber's neck indicated that she was strangled from behind.

In addition to this evidence of ligature strangulation, Dr. Lacy testified that Amber's internal injuries to the neck and jaw evidenced she was also strangled manually from the front. According to Dr. Lacy, Amber sustained significant injury on the inside of her neck, including a broken hyoid bone on top of her voice box, with significant bleeding in the muscles of her neck in different areas than the ligature markings, suggesting the perpetrator had at some point used his hands to compress her neck. A broken hyoid bone is common in victims of manual strangulation. In addition, Dr. Lacy found the bruising was not localized to the ligature furrow. "The entirety of her neck, from the bottom to the top, right from underneath the chin, all the way to the bottom of the knot of your tie, is where she was bruised inside[.]"

Dr. Lacy also identified wounds suggesting a physical struggle before death. He opined that she had additional bruising around her chin and on her tongue, injuries consistent with someone struggling and trying to protect themselves from being strangled. And Dr. Lacy pointed out bruising around the left side of Amber's face indicating she had been struck multiple times. Dr. Emmanual Lacsina, the forensic pathologist who performed the autopsy, similarly testified that Amber had sustained significant blunt force injuries to her head.

The experts' testimony was supported by other evidence in the record. Kalac testified at trial that he recalled placing his hands around Amber's neck. And his confession note explicitly stated that he had strangled Amber "with my hands then a shoelace." Police found a shoelace in Kalac's backpack in Amber's abandoned car. The WSP crime lab identified both Kalac's and Amber's DNA on the shoelace.

The evidence supports the conclusion that Kalac first attempted to strangle Amber manually from the front, and when that did not work, he stopped what he was doing long enough to locate a shoelace, wrapped it around her neck not once, but twice, and repositioned himself behind her, pulling hard enough and long enough to cause her death.

Kalac relies on State v. Bingham, 105 Wn.2d 820, 719 P.2d 109 (1986), to argue that strangulation alone is insufficient to prove premeditation. In Bingham, the medical examiner testified the victim had died by "asphyxiation through manual strangulation," accomplished by applying continuous pressure to the victim's windpipe for three to five minutes. Id. at 822. After being convicted of aggravated

first degree murder, Bingham challenged the sufficiency of evidence of premeditation. Id. at 822-23. Although there was evidence the victim had engaged in sex before she was murdered, there were no other physical injuries that could be identified as having been inflicted before her death. Id. at 822.

The Supreme Court determined the evidence of manual strangulation alone was insufficient to establish premeditation. Id. at 825-26, 828. The court concluded that "a finding of premeditation only because the act takes an appreciable amount of time obliterates the distinction between first and second degree murder . . . [because] [h]aving the opportunity to deliberate is not evidence the defendant did deliberate." Id. at 826. The court reasoned that if opportunity to deliberate was considered synonymous with premeditation then "any form of killing which took more than a moment could result in a finding of premeditation, without some additional evidence showing reflection." Id.

In reaching this conclusion, the court distinguished two cases which involved evidence of both strangulation and the infliction of additional injuries over a period of time. Id. at 825. In State v. Harris, 62 Wn.2d 858, 385 P.2d 18 (1963), after striking the victim on the head with enough force to fracture her skull and jaw, the defendant then strangled her with a vacuum cleaner cord, the ultimate cause of death. Bingham, 105 Wn.2d at 825 (quoting Harris, 62 Wn.2d at 868). And in State v. Gaines, 144 Wash. 446, 258 P. 508 (1927), the defendant choked the victim until she was unconscious, and then went to a nearby garbage dump, got a rock, and returned to beat the unconscious victim to death. Bingham, 105 Wn.2d at 825 (quoting Gaines, 144 Wash. at 467). These cases, the Supreme Court said,

involved evidence of deliberation or reflection before or during the act that led to the victims' deaths. Id. at 826-27.

Amber's death—by both manual and ligature strangulation—is similar to Harris and Gaines and distinguishable from Bingham. Unlike in Bingham, there was evidence Kalac deliberated and reflected on how to strangle Amber. Amber suffered significant blows to her head and torso, was strangled manually from the front, and strangled with a ligature from behind. The State had no evidence in Bingham that the defendant stopped mid-assault to locate an alternative weapon to finish the murder, but the evidence here supports that Kalac did just that. A reasonable juror could conclude that Kalac found the manual strangulation too difficult, stopped to search for a ligature, then deliberated on how to best use the shoelace to finish the job. See also State v. Gibson, 47 Wn. App. 309, 312, 734 P.2d 32 (1987) (evidence sufficient to establish premeditation where victim suffered three separate blunt force skull injuries before being strangled to death by rope or cord).

Although Dr. Lacsina testified he could not conclude, as did Dr. Lacy, that the extensive bruising on Amber's body evidenced manual strangulation, we must view all evidence in the light most favorable to the State, State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992), and defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence, State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (jury makes credibility determinations that are not subject to review on appeal). Even if we relied on Dr. Lacsina's testimony alone, the evidence was sufficient to permit a

jury to find the element of premeditation beyond a reasonable doubt. Dr. Lacsina testified that Amber sustained significant blunt force trauma to her head and upper torso. In his opinion, there was probably more than one blow to her head. And he believed the severe head injuries would have incapacitated Amber on the basis of a concussion. The bite marks on Amber's breasts, which tested positive for Kalac's DNA, were made while she was still alive. And the ultimate cause of death was asphyxia caused by the ligature strangulation. This evidence suggests Kalac bit and beat Amber before picking up a ligature, wrapping it around her neck twice and asphyxiating her.

As the Court recognized in State v. Ollens, 107 Wn.2d 848, 853, 733 P.2d 984 (1987), Bingham was based on the fact that the evidence of death by manual strangulation involved one continuous act. But in Ollens, unlike Bingham, the defendant inflicted stab wounds before slashing the victim's throat during the course of a robbery. Id. at 849. The fact that the defendant committed two distinct injurious acts, rather than a single continuous one, the fact the defendant chose to use a knife as a weapon, and the fact that the defendant had a motive all supported the existence of premeditation. Id. at 853.

Here, the State presented circumstantial evidence of Kalac's possible motive. Kalac's long-time best friend, Malinda Cool, testified that he called her one day very excited to tell her that he and Amber were expecting their first child together. But Detective Gundrum testified she found paperwork in the bedroom indicating Amber had had an abortion. And Amber's best friend, Wendy Nelson, confirmed Amber was not pregnant when she was killed because she had taken

an abortion pill. Kalac conceded on the stand that he would have been very angry at Amber had she told him of the abortion. A reasonable juror could infer that Amber's decision to terminate her pregnancy provided a motive for Kalac's actions.

Kalac argues that not all characteristics "particularly relevant to establish[ing] premeditation"—motive, procurement of a weapon, stealth, and the method of killing—are present here. Pirtle, 127 Wn.2d at 644. He asserts the State failed to show that he procured a weapon or committed the murder in a stealthy manner. While these factors are relevant in evaluating premeditation; they are not required elements of the crime. Obtaining a weapon and acting through stealth can evidence planning, Pirtle, 127 Wn.2d at 644, but premeditation does not require planning; it requires "'deliberate formation of and reflection upon the intent to take a human life,'" Bingham, 105 Wn.2d at 823 (quoting State v. Robtoy, 98 Wn.2d 30, 43, 653 P.2d 284 (1982), abrogation recognized by State v. Radcliffe, 164 Wn.2d 900, 907, 194 P.3d 250 (2008)).

Looking at the evidence in the light most favorable to the State, the State presented sufficient circumstantial evidence from which a jury could draw reasonable inferences, and the jury's verdict is supported by substantial evidence. We conclude the State met its burden to prove the premeditation element of first degree murder.

D. Refusal to Instruct Jury on Manslaughter

Kalac also argues the trial court erred when it refused to instruct the jury on the elements of first degree manslaughter. We conclude that given the facts of

this case, under State v. Schierman, any possible error in not instructing the jury on the lesser crime of first degree manslaughter was harmless.

Kalac testified he was in an alcoholic blackout when he killed Amber. And his expert, Dr. Dixon, testified that Kalac's late stage alcohol use disorder had so adversely affected his neurocognitive functioning that Kalac could not premeditate Amber's murder. The trial court ruled this evidence was sufficient to instruct the jury on diminished capacity for first degree murder but not for second degree murder. It ruled that Dr. Dixon could not testify that Kalac's mental disorder adversely affected his ability to form the general intent required for second degree murder. Kalac's counsel asked the court if he was precluded from arguing to the jury that Kalac's mental disorder precluded him from forming the intent to murder. The trial court stated:

> [W]hatever evidence is in the record, it's not up to me to control how you want to argue the evidence and the instructions. I'm just not allowing the doctor to render the opinion, and that's the [ER] 702 analysis . . . based upon the evidence that's already in the record.
>
> . . . .
>
> Evidence is evidence. I can't restrict you from arguing the evidence as it relates to the instructions.

Based on Kalac's testimony and the opinions of Dr. Dixon, Kalac requested a first degree manslaughter instruction. He argued that if the jury found he lacked the capacity to premeditate or to form the intent to murder Amber, the jury should be given the option of finding his conduct was reckless. The trial court refused to give a manslaughter instruction, concluding that even if the jury could find that Kalac's intoxication eliminated his ability to form the intent to kill, Kalac was not

entitled to a manslaughter instruction without evidence that his actions were reckless rather than intentional.

A party is entitled to have the jury instructed on a lesser included offense if that offense satisfies the two-pronged test established in State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). Schierman, 192 Wn.2d at 657. Under the first (legal) prong, the offense must consist solely of elements necessary for the conviction of a greater offense charged. Id. Under the second (factual) prong, the evidence must support an inference that only the lesser offense was committed, to the exclusion of the greater offense charged. Id. "It is error to give an instruction not supported by the evidence." State v. Warden, 133 Wn.2d 559, 563, 947 P.2d 708 (1997).

In this case, we review the trial court's refusal to give the manslaughter instruction for abuse of discretion because it is based on the factual[12] determination that the evidence did not support an inference that Kalac committed first degree manslaughter (a reckless homicide) to the exclusion of either intentional (second degree) or premediated (first degree) murder. Schierman, 192 Wn.2d at 657. To satisfy Workman's factual prong, "'[i]t is not enough that the jury might simply disbelieve the State's evidence. Instead, some evidence must be presented which affirmatively establishes the defendant's theory on the lesser included offense before an instruction will be given.'" State v. Berlin, 133 Wn.2d

---

[12] The State concedes that Workman's legal prong was met, since first and second degree manslaughter consist solely of elements necessary for a conviction of first degree (premeditated) murder. See Schierman, 192 Wn.2d at 657.

541, 546, 947 P.2d 700 (1997) (quoting State v. Fowler, 114 Wn.2d 59, 67, 785 P.2d 808 (1990)).

Kalac relies on State v. Warden to argue the evidence was sufficient to raise an inference that he committed manslaughter rather than murder in the second degree. In Warden, the defendant admitted she killed a woman by breaking a Mason jar over the victim's head and stabbing her with a kitchen knife. 133 Wn.2d at 561. Warden's expert testified that because she suffered from posttraumatic stress disorder, she lacked the mental capacity to form the intent to kill. Id. at 564. The trial court instructed the jury on first and second degree murder and diminished capacity but refused Warden's requested manslaughter instructions. Id. at 561.

The Supreme Court reversed the conviction because the "evidence presented in this case supports an inference that the lesser crime was committed." Id. at 564. It pointed to the fact that "during deliberations, [the jury] asked the court: 'May we consider finding the defendant guilty of accidental manslaughter, assault resulting in death, or some other "lesser crime."'" Id. It concluded that refusing to give the manslaughter instructions deprived Warden of her right to argue her theory of the case. Id.

And in Schierman, the Supreme Court similarly held that the defendant accused of stabbing four people to death was entitled to a manslaughter instruction in a case in which the evidence of his voluntary intoxication raised an inference that he could not form the intent to commit murder. 192 Wn.2d at 658-59.

One could reasonably argue that Warden and Schierman are factually distinguishable from this case. In State v. Wade, 186 Wn. App. 749, 346 P.3d 838

(2015), this court concluded that a defendant, convicted of murdering his victim by strangulation, was not entitled to an instruction on the lesser-included crime of manslaughter:

> There was no evidence that the strangulation was either reckless or the result of criminal negligence. [The State's expert] testified that [the victim] died of asphyxia due to strangulation, and that death would take one to two minutes of continuous pressure. The undisputed testimony established that whether [the victim] was intentionally strangled manually or with a ligature, Wade had to continue to apply pressure, even after she lost consciousness, for one to two minutes.

Id. at 772-73. We held that this evidence would not support an inference that the defendant committed manslaughter, rather than murder. Id.

As in Wade, Kalac points to no evidence that his strangulation of Amber was reckless. Dr. Lacy testified that once oxygen stopped flowing to Amber's brain, it would have taken at least one minute of continuous pressure to cause her death. Kalac testified he had no recollection of strangling Amber with a ligature that night, although he recalled having his hands around her neck. In addition to testifying that Kalac lacked the capacity to premeditate Amber's murder, Dr. Dixon testified that Kalac's extreme alcohol use disorder also affected his ability to remember his actions. As the trial court indicated, this latter evidence supported only one of two inferences—either Kalac intended to kill Amber, in which case the jury would convict him of murder, or Kalac lacked the capacity to form intent, in which case it would acquit him of murder. Kalac cites no case in which a court has held that a jury could reasonably find that strangulation by ligature was reckless, rather than intentional.

Although Warden and Schierman may not mandate a manslaughter instruction in a ligature strangulation case, we need not resolve this issue.  Even if the trial court abused its discretion in denying Kalac's requested manslaughter instruction, the error was harmless.  The jury rejected Kalac's diminished capacity defense and convicted him of first degree premeditated murder.  As the Supreme Court held in Schierman, the only possible explanation for the verdict is that the "jury did not credit the theory that an alcoholic blackout diminished [Kalac's] capacity to premeditate," and a manslaughter instruction could not have led the jury to a different conclusion.  192 Wn.2d at 661.  Thus, any possible error caused by not instructing the jury on first degree manslaughter was harmless.

E.  Exceptional Sentence

Lastly, Kalac argues the trial court abused its discretion in imposing an exceptional sentence because there was insufficient evidence to support two of the aggravating factors.  He also argues the trial court erred in considering the possibility that he might earn "good time" early release credits when imposing the exceptional sentence.  We reject both arguments.

1.  Aggravating Factors

Exceptional sentences are subject only to a statutory standard of review. RCW 9.94A.535; see also State v. Stubbs, 170 Wn.2d 117, 123, 240 P.3d 143 (2010).  Specifically,

> To reverse a sentence which is outside the standard sentence range, the reviewing court must find:  (a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or

(b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.585(4). Under subsection (a), a jury must find any facts supporting aggravating circumstances beyond a reasonable doubt and by special interrogatory, and the special interrogatory is reviewed under the sufficiency of the evidence standard. Stubbs, 170 Wn.2d at 123. In this case, the jury found that Kalac demonstrated an egregious lack of remorse, RCW 9.94A.535(3)(q), and that his actions involved a destructive and foreseeable impact on persons other than the victim, RCW 9.94A.535(3)(r).

### a. Egregious Lack of Remorse—RCW 9.94A.535(3)(q)

Kalac contends there was insufficient evidence to prove he demonstrated an egregious, unusual lack of remorse. He points to his testimony during which he expressed remorse and to his sentencing allocution where he said he was truly sorry and would never forgive himself. The jury finding occurred before Kalac's sentencing hearing occurred, so any statement he made there is immaterial. We must determine if Kalac's testimony at trial is somehow sufficient to negate the evidence the State presented.

"'Whether a sufficient quantity or quality of remorse is present in any case depends on the facts.'" State v. Zigan, 166 Wn. App. 597, 602, 270 P.3d 625 (2012) (quoting State v. Ross, 71 Wn. App. 556, 563, 861 P.2d 473 (1993)). In Zigan, Division Three concluded that evidence that Zigan laughed and joked with officers at the crime scene, and smiled and waved to the inmates telling them to not get caught if they hit someone with a motorcycle was sufficient to demonstrate Zigan did not exhibit remorse for committing vehicular homicide. Id. at 602-03.

Here, the jury was free to reject Kalac's testimony that he was sorry for Amber's death. The jury heard testimony that Kalac beat and strangled Amber, then posed Amber's nude body to take photos, wrote profane comments on her body with a permanent marker, spent time gathering his personal belongings before stealing Amber's credit card and car, drove for hours before stopping to pawn a laptop and purchase a BB gun, and then posted the photos he had taken online, joking that "she fought so [d]amn hard," and "Turns out its way harder to strangle someone to death than it looks [i]n the movies." He texted his boss and a friend and told the 4chan community to watch the news. He then bragged in his confession note that he had killed Amber for "no reason other than I was drunk and she pissed me off." He described "running from the cops" as being "so fun."

Taken in the light most favorable to the State, a rational trier of fact could have found Kalac exhibited an egregious, unusual lack of remorse. See, e.g., State v. Erickson, 108 Wn. App. 732, 739-40, 33 P.3d 85 (2001) (evidence of defendant smiling, laughing, bragging, and joking about the murder demonstrated a lack of remorse); Ross, 71 Wn. App. at 563-64 (defendant's testimony that he was sorry for the victim's death not sufficient to show remorse where trial court did not find defendant credible and defendant blamed the justice system for his crimes). We conclude sufficient evidence supports the egregious lack of remorse aggravating factor.

### b. Destructive and Foreseeable Impact on Persons Other than the Victim—RCW 9.94A.535(3)(r)

Next, Kalac contends the evidence does not support a finding that Amber's murder had a "destructive impact" on either B.C. or Paul. We again review the

evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the presence of this aggravating circumstances beyond a reasonable doubt. State v. Chanthabouly, 164 Wn. App. 104, 143, 262 P.3d 144 (2011).

The statute does not define the phrase "destructive impact." This court has previously said that for RCW 9.94A.535(3)(r) to apply, a defendant's actions must be of a destructive nature that is not normally associated with the commission of the offense. State v. Webb, 162 Wn. App. 195, 206, 252 P.3d 424 (2011). We have noted that cases examining this aggravating factor have often involved children who witnessed the crimes or learned of a violent crime involving a family member or close friend after the fact. Id. But as the trial court noted below, we have not defined the phrase so that courts understand the criteria to apply to it.

When interpreting criminal statutes, we look to the statute's plain language. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). The plain meaning of a statute is discerned "from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). To discern the plain meaning of an undefined statutory term, we give words their usual and ordinary meaning and interpret them in the context of the statute in which they appear. Newton v. State, 192 Wn. App. 931, 936-37, 369 P.3d 511 (2016). We may use a dictionary to define the plain meaning of an undefined statutory term. Id. at 937.

Webster's defines "destructive" as "tending to impair, damage, or wreck." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 615 (2002). And it defines "impact" in this context as meaning a "force producing change." Id. at 1131. It cites as a synonym the word "shock." Id. From these definitions, the aggravating factor of a "destructive impact" on persons other than the victim clearly involves some type of shock so forceful in nature that it causes a damaging impact on the life or lives of those individuals.

The evidence here established that B.C., the teenage son of Kalac's victim, although not in the same room with his mother when she was killed, was present in the apartment when Kalac murdered her and, according to the State's 3D mapping of the crime scene, was probably no more than 10 feet away when it happened. B.C. found Amber after smelling an odd "stench" coming from her bedroom. The forensic pathologists testified Amber was in an advanced stage of decomposition when she was found some 15 hours after her death. And B.C. and his brothers had the misfortune of seeing the obscene pictures Kalac posted to 4chan on the Internet. Although B.C. did not see Amber's brutalized body when he discovered her, we see very little difference between having to undergo that type of traumatic event and having to see photographs of his dead mother—naked and clearly posed to make her ligature marks so visible—on the Internet.

Paul testified that finding Amber "most definitely" had a negative impact on B.C., above and beyond the typical impact a child experiences on losing their mother. Paul noticed significant impacts on how B.C. copes with day-to-day life following his mother's murder. Paul testified that B.C.'s discovery of his murdered

mother in her bedroom had affected his schoolwork, his relationship with him, his grandparents, and his siblings, and, in general, he just "doesn't like people" anymore. Paul reported that B.C. and his brothers were experiencing night terrors because of the photos they had seen of their mother.

Looking at the facts in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that B.C. has experienced a shock so forceful in nature that it has caused a damaging impact on his life. We conclude sufficient evidence supports the second aggravating factor, substantial and compelling reasons justifying Kalac's exceptional sentence.

2.  Trial Court's Reference to Potential Good Time Credit

Finally, Kalac argues the trial court erred in considering the possibility that he might earn good time early release credits. We conclude resentencing is unnecessary based on the record before us.

At the sentencing hearing, the State asked the trial court to consider doubling or trebling the standard range of 31 to 41 years. It contended that the formula the court ultimately chose did not matter but the "right range is a range that puts this person in custody for his life." It cited to the heinous nature of the crime and the fact that the pictures of Amber, naked and dead, will reside on the Internet for the duration of her children's lives. Kalac asked the court to impose a 45-year sentence, reflecting the top of the standard range plus 2 years for each of the two aggravators.

In rendering the sentence, the court noted that the standard range in the case is 31 to 41 years and that Kalac has the opportunity to earn some of that time

as a good time credit. Based on Kalac's age of 35, the court calculated a standard range sentence would result in a likely period of incarceration of 38 years, putting Kalac's release at age 73. But the court then went on to discuss the specific facts of this crime and the impact on Amber's family. It stated:

> There are things about this crime that are different than any other homicide that I have been privy to, two things. One is the behavior of the defendant after having killed Amber with respect to how she was found, marking, writing on her body, biting, things like that.
>
> . . .
>
> And then there was the posting of the photographs and the discussion on the internet, and that can't be ignored. That is, as the prosecutor says, the defendant's demonstration of the lack of remorse.
>
> The presence of the internet makes this very different than crimes I attended to when I was in my 30s, but we didn't have the internet back then. Homicides, murders, victim's family members, communities were left to heal, because the gruesome nature of the crime became compartmentalized in memories, and it could be diminished by memory and by life itself and moving forward.
>
> This is not that case. This is not that case because the internet keeps the gruesome nature of this crime present and alive forever, despite the efforts of the owners of that particular site to erase the photographs. In the few hours that they were up on 4chan, they became widespread throughout the world.
>
> And just like the detective who downloaded the pages so that he could preserve them on his computer, we have no idea what other databanks exist. But they do, and you can find them. Like the prosecutor said, if you, [B.C.], want to Google yourself when you're 20 years old, your mother's homicide will come up.
>
> So how do they heal? How do they survive this? How do they move forward? I can't answer that question, but I do know who's the one who caused all of that to happen and what punishment fits that crime.

The court then addressed Kalac's addiction, noting that it recognized his condition as a disease. But, because of the competing issues, it concluded the appropriate

sentence was one that would ensure he stayed in prison for life. It imposed the exceptional sentence of 82 years.

When we read the trial court's oral ruling in its entirety, it is clear it did not believe a standard range sentence was appropriate, in part because, with good time credits, such a sentence would allow Kalac to be released from prison in his early 70s. Under the Sentencing Reform Act,[13] the trial court may not consider a defendant's potential good time credits when imposing an exceptional sentence. State v. Wakefield, 130 Wn.2d 464, 477-78, 925 P.2d 183 (1996). Although the trial court should not have referred to the good time credits here, we do not deem it to be reversible error. As the Supreme Court noted in Wakefield:

> [A] trial court's reliance on the availability of good time credits when imposing an exceptional sentence does not automatically result in a reversal of the sentence. If overwhelming aggravating factors exist to justify an exceptional sentence, the sentence will be upheld even if the trial court improperly relied on the possibility of good time credits.

Id. at 478. Even if the trial court initially considered the possibility for early release, it was clear from the record that "in all probability" the court would impose the same sentence on remand given the circumstances of the case, making resentencing unnecessary. Id.

Like Wakefield, the trial court initially referred to good time credits Kalac might earn if serving a standard-range sentence. But based on the trial court's thoughtful analysis of how this crime differs from most other murders it has seen and the long-lasting impact it will have on Amber's family, and the overwhelming

---

[13] Chapter 9.94A RCW.

- 45 -

evidence supporting the aggravating factors, we are convinced the court would impose the same sentence were we to remand this case for resentencing.

We affirm Kalac's convictions and sentence and remand for the sole purpose of striking the fees and nonrestitution interest from Kalac's judgment and sentence.

_Andrus, A.C.J._

WE CONCUR:

_Brennan, J_  _Smith, J._